Argued January 25, affirmed February 23, 1955

# STATE HIGHWAY COMMISSION *v.* STATE CONSTRUCTION COMPANY and CONTINENTAL CASUALTY COMPANY
### 280 P. 2d 370

*Charles Peterson,* Salem, argued the cause for appellant. With him on the brief were Robert Y. Thorn-

ton, Attorney General, C. W. Enfield, Assistant Attorney General and Chief Counsel for Oregon State Highway Commission, and Leonard I. Lindas, all of Salem.

*L. A. Recken*, Portland, argued the cause for respondents. On the brief were Recken & Recken, Portland, and Henry Elliott, Seattle, Washington.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

TOOZE, J.

This suit was originally commenced as an action at law to recover the sum of $8,634.95 and was brought by the State of Oregon, by and through its State Highway Commission, as plaintiff, against State Construction Company, a corporation, and Continental Casualty Company, a corporation, as defendants. Defendants answered plaintiff's complaint and affirmatively pleaded matters arising out of the facts requiring the interposition of a court of equity, and material to their defense in the law action, and prayed for affirmative relief. Pursuant to the provisions of ORS 16.460, the action at law was stayed and the case thereafter proceeded as a suit in equity. A decree was entered in favor of defendants. Plaintiff appeals.

This litigation involves the liability of a bidder and its surety upon a bid for the construction of five piers for a bridge spanning the Willamette river, a navigable stream, in Marion and Polk counties, Oregon. The Salem-Dallas highway is an established state highway running in a general easterly and westerly direction between the city of Dallas, in Polk county, and the city of Salem, in Polk and Marion counties. As permanently located by the State Highway Commission, the

route of said highway crosses the Willamette river within the corporate limits of the city of Salem, the easterly end or approach of which river crossing is in Marion county and on Marion street; the westerly end or approach connects with the Salem-Dallas highway in Polk county.

Having found it to be in the public interests to construct such bridge, to be known as the Marion Street Bridge, and having secured the necessary approval of the War Department, the Highway Commission caused plans, specifications and other engineering data to be prepared for use and employment in connection with a call for competitive bids for the construction of piers numbered one to five as a part of said proposed bridge structure. Pier No. 1 was to be constructed on the high bank on the easterly side of the river, Piers Nos. 2, 3, 4 and 5 in the river itself, No. 5 below low water mark on the west side of the river.

The proposed construction was a Federal Aid Project, the United States, through its Bureau of Public Roads, to pay approximately 50 per cent of the cost. As a condition of Federal aid, the approval of the Bureau of Public Roads of the plans and specifications for the structure was required. At the time bids were called for in connection with the construction and installation of the piers, the Bureau of Public Roads had not given its formal approval to the plans and specifications.

However, the Highway Commission issued and published a call for competitive bids for the construction and installation of said piers, bids to be submitted to and filed with the commission for consideration at a meeting to be held April 24, 1950, in Portland, Oregon, at 9:00 A.M. The Commission reserved the right

to reject any or all bids, or to accept the proposal deemed best for the state of Oregon.

In the bid proposal form prepared by the Commission for use of prospective bidders, the bid was subdivided into seven separate items, the bidder being required to subdivide his bid accordingly.

State Construction Company is a Washington corporation, with its principal offices located in Seattle, and is authorized to transact business within the state of Oregon. It was duly qualified as a bidder under the provisions of §§ 98-102 to 98-106, OCLA (ORS 279.010 to 279.028). Alfred H. Cohn is the president and general manager of said corporation. He is a registered engineer in the state of Washington. Edgar C. Hart is general superintendent on heavy construction for and a stockholder of the corporation.

The printed form for bid proposal for the construction of the piers for the Marion Street Bridge, together with the plans and specifications therefor, were furnished the defendant Construction Company by the Highway Commission.

Cohn and Hart made a trip to Salem, where they interviewed members of the engineering department of the Highway Commission, and also looked over and investigated the site for the construction of the piers. They interviewed materialmen, investigated labor conditions, river conditions, and secured other available data necessary to prepare a bid. At the same time they were investigating the proposed construction of an overhead pass on State Highway No. 99 at Eugene, with a view to bidding thereon; bids were to be opened on Tuesday, April 25, 1950.

Upon their return to Seattle, Cohn and Hart commenced work on the preparation of bids of the Con-

struction Company. They had but a few days within which to prepare the same. Hart did most of the figuring, Cohn securing the prices of the needed materials. The first item on the form of proposal for the bridge piers was for "shoring, cribbing, etc." This item included construction of the necessary cofferdams. Included in the first item were necessary dredge work, lumber, labor and approximately 400,000 pounds of steel sheet piling. The cost of the necessary steel sheet piling delivered to the job site approximated $35,000. It was the inadvertent omission of the cost of this steel piling from the completed bid of the defendant Construction Company that led to the instant litigation.

In the preparation of their proposal, Cohn and Hart were compelled to work rapidly in order to complete the bid and get it into the mail by Friday evening, April 21. It was to be and was mailed on Friday to the defendant Continental Casualty Company in Portland, which corporation was to furnish the bidder's bond and file the bid and bond with the Commission before 9:00 A.M. on Monday, April 24.

At the time Hart finished his work-sheet summary of the items and their cost, going to make up the bid respecting shoring and cribbing, he had not been furnished the cost of the steel sheet piling and on his tabulation left that cost open. On Friday, the cost thereof was furnished him by Cohn, that is, the cost per pound. Cohn had secured this information from the Bethlehem Steel Corporation in Seattle. The cost was seven cents per pound f.o.b. Salem, Oregon. An additional cost for transportation from railroad to the work site was also involved. Although Hart was given this cost by Cohn on Friday, in his haste to get the final figures to Cohn, who made up the formal bid,

he inadvertently omitted to extend that cost on his work-sheet summary.

Hart's summary as to item No. 1 (shoring, cribbing, etc.) on his work sheets, prepared before information had been received as to the cost of the steel sheet piling, is as follows:

"Piling 152-50' 144-25'

| | |
|---|---:|
| Lumber 35M at 300.00 | 10500.00 |
| Dredge 2½ Mo. | 5000.00 |
| Labor | 2500.00 |
| | 18000.00 |
| Sup | 1000.00 |
| | 19000.00 |
| Miss | 5000.00 |
| | 24000.00 |
| Drive & Pul. | 7400.00 |
| | 31400.00 |
| | 3100.00 |
| | 34500.00'' |

The figures 152-50' and 144-25' referred to the number and length of steel piling required, that is, 152 piling 50 feet in length, and 144 piling 25 feet in length. The amount of $3,100.00 represented the estimated profit. As before observed, Hart failed to extend the cost of the steel sheet piling in the above summary.

After completing all his estimates upon the seven items included in the bid, Hart transferred the totals from his work sheets to a final estimate sheet, which he turned over to Cohn, and from which Cohn prepared the bid proposal. This final estimate sheet delivered to Cohn carried the figures $34,000.00 for item 1, and Cohn placed those figures in the bid as submitted to

the Highway Commission. The cost of steel sheet piling was entirely omitted from the bid. The bid, prepared upon the form furnished by the Highway Commission, was as follows:

"Marion Street Bridge Piers     Bid Sheet

| Item No. | Item and Quantity | Unit Price | Amount |
|---|---|---|---|
| 1. | Shoring, Cribbing, etc. All required<br>For Thirty-four thousand dollars     Lump sum | $34,000.00 | $34,000.00 |
| 2. | Structural Excavation<br>2,200 Cu. Yds.<br>For Six dollars and fifty cents<br>Per Cu. Yd.  $ | 6.50 | $14,300.00 |
| 3. | Structural Excavation<br>Below Elevations Shown<br>40 Cu. Yds.<br>For Ten dollars<br>Per Cu. Yd.  $ | 10.00 | $    400.00 |
| 4. | Furnish Foundation Piling<br>9,400 Lin. Ft.<br>For Forty cents<br>Per Lin. Ft.  $ | 0.40 | $ 3,760.00 |
| 5. | Drive Piles     286 Only<br>For Thirty-six dollars & fifty cents     Per each  $ | 36.50 | $10,439.00 |
| 6. | Class "A" Concrete<br>1,800 Cu. Yds.<br>For Fifty dollars<br>Per Cu. Yd.  $ | 50.00 | $90,000.00 |
| 7. | Metal Reinforcement<br>220,000 Lbs.<br>For nine cents     Per Lb.  $ | 0.09 | $19,800.00 |
|  | Total Amount of Bid |  | $172,699.00" |

We pause to note the fact that prior to the time the call for bids was issued and published, and in keeping with the practice in such cases, the engineering department of the Highway Commission furnished to the Commission its own estimate of the costs of the project. This estimate is furnished for the information of the Commission only. That estimate was as follows:

"1. All required
   Shoring, Cribbing, etc. .................... $ 80,000.00

2. 2,200 cu. yds.
   Excavation ..................... $10.00    22,000.00

3. 40 cu. yds.
   Excavation Below
   Elevations Shown ............. 10.00        400.00

4. 9,400 Lin. ft.
   Furnish Foundation
   Piling ................................. .40    3,760.00

5. 286 only
   Drive Piles ..................... 45.00     12,870.00

6. 1,800 cu. yds.
   Class "A" Concrete ........ 55.00          99,000.00

7. 220,000 lbs.
   Metal Reinforcement ...... .10            22,000.00

   For Comparison of Bids ...... $240,030.00

## ESTIMATED CONSTRUCTION AUTHORIZATION

Estimated Contract Amount .......... $240,030.00
Anticipated Additional Items .......... .................

                                      $240,030.00
Engr. & Cont. (10 per cent) ............. 24,003.00

Estimated Net Authorization,
   Constr. ................................. $264,033.00"

On Monday, April 24, 1950, the bids were opened by the Highway Commission. There were five bids, including that of the defendant State Construction Company. On Item No. 1, the bid of M. T. Butler & C. M. Halvorson was $136,000 (as compared to $34,000 in defendant's bid), and their total bid on all seven items was $269,500.00 (as compared to $172,699.00 in defendant's bid); the bid of Guy F. Atkinson Company on Item No. 1 was $163,500.00, and its total bid on all items was $292,792.00; the bid of Lee Hoffman on Item No. 1 was $99,900.00, and his total bid on all items was $232,980.00; the bid of General Construction Company on Item No. 1 was $130,000.00, and its total bid on all items was $288,940.00.

At the time the bids were opened, certain rights of way on the west side of the Willamette river had not yet been procured by the Highway Commission. The minutes of the Commission meeting on April 24 show a discussion respecting this right of way matter and then state:

"The Commission decided unanimously to hold up the award of the contract for the construction of piers for the Marion Street Bridge, bids for which were received this day, until all right of way matters pertaining to the project have been disposed of satisfactorily."

The minutes for the meeting of April 24 further show:

"Construction of five piers for the Marion Street Bridge over the Willamette River in Salem in Marion and Polk Counties. State Construction Company, Seattle, submitted the low bid for this work at $172,699. Lee Hoffman, Portland, submitted the next low bid at $232,980. There were three higher bids. The Commission has deferred the award of this contract until the following day. (The

Commission later referred the bids to the Engineer with power to award the contract to the low bidder, State Construction Company, when certain right of of way matters have been cleared.)''

The minutes for the adjourned meeting of April 25 show that the Chief Counsel for the Commission recommended that condemnation proceedings be commenced to acquire the necessary right of way over lands of one Wilber T. Lewis in Polk county. It is then stated in the minutes:

"He [Chief Counsel] also recommended that the award of the contract for the construction of bridge piers, for which a satisfactory bid was received at this letting, be deferred until this right of way matter has been settled, or at least until the condemnation papers have been filed. * * * The Commission also decided to hold up the award of the contract for construction of the bridge piers until the condemnation papers have been filed in court.

"In this connection, Chairman Chandler reiterated that the Commission hereafter wants all right of way matters in connection with each construction project satisfactorily disposed of before that project is advertised for bids. * * *''

Cohn was present at the Commission meeting on April 24 when the bids were opened. The great difference between the bid of State Construction Company and that of the next low bidder, Lee Hoffman (a difference of $60,281.00), caused Cohn immediately to suspect that an error or mistake had crept into the bid he submitted on behalf of his company, although at the time he had no idea what the mistake consisted of nor how it occurred.

On April 26 Cohn went to Salem to see Mr. H. B. Glaisyer, clerk of the Highway Commission, after having talked with him over the long distance telephone.

He also talked with Mr. Glen S. Paxson, Chief Bridge Engineer for the Highway Commission "in charge of all bridges, structures on the State Highway System, both design and construction."

Both Glaisyer and Paxson told him that his bid was pretty low. Cohn told them he would go back to Seattle and make an investigation in an endeavor to ascertain wherein the mistake had been made. In the meantime, Hart had gone to Eastern Washington where his company was engaged in construction work. As soon as Cohn reach Seattle he telephoned to Hart and had him return to the home office. Cohn and Hart then proceeded with their investigation. On April 28, they discovered the mistake made in Hart's work-sheet summary and the entire omission of the cost of the steel sheet piling in their estimates and bid.

Cohn immediately telephoned to R. H. Baldock, Chief Engineer for the Highway Commission, advising him of the error, and made an appointment to meet him in Salem on Tuesday, May 2. At the same time Cohn prepared the following letter addressed to the Oregon State Highway Commission:

"April 28, 1950

Oregon State Highway Commission
Salem, Oregon  Attn. Mr. R. H. Baldock

Gentlemen:

"In conformance with our telephone conversation to Mr. R. H. Baldock of April 28, 1950, we request that our bid of April 24, 1950, submitted for the construction of piers for the Marion Street Bridge, Willamette River, Salem, Oregon, Salem-Dallas Highway, be withdrawn, unless someway could be found to increase our bid by $40,000.

"After thorough checking, we found that we had omitted the price of the sheet piling, a sum of about $40,000, from our bid item—shoring and cribbing.

Somehow, in the rush of preparing the bid, this amount was inadvertently omitted.

"We are more than sorry that this happened. Unless some other way or arrangement could be made to increase our bid, as previously stated, we would appreciate it if you could see your way clear to return our bid bond to us.

"Yours very truly,

STATE CONSTRUCTION CO.
A. H. Cohn.''

On Tuesday, May 2, Cohn and Hart met Baldock in Salem and delivered the above letter to him. According to the testimony of Cohn, the following occurred at that meeting:

"Q. Now, at that time did you have any discussion with Mr. Baldock? A. First thing we did with Mr. Baldock, we presented the letter, and then we talked it over with him. We said, 'is there any possibility of the State's furnishing us the sheet piling,' and we would carry the contract on just the way it was if they would furnish the sheet piling.

"Q. That is, at the bid submitted? A. That is, as the bid, as submitted. That is correct.

"Q. Did Mr. Baldock say anything with reference to that? A. He went into another room, and he talked with, I don't know, but he come out, and he said that if, if this was a private corporation that is the first thing they would do, but he said, 'when it is the State, we cannot do it.'

"Q. Did you subsequently receive plans for the second bidding of the Marion Street job, Mr. Cohn? A. At the time we talked to Mr. Baldock we told him that we would not be able to submit the bid. We would not be able to carry, to accept the contract, and up to that time he had never told us definitely that we were to be awarded the contract.

"Q. Did he tell you that day that you were to be awarded the contract? A. He told us, well, we said, 'if we throw this thing up—' he said, 'if we

award the contract to you, will you definitely turn it down?' I says, 'yes, here is a letter to substantiate it'. He said, 'well, okay, I will put this thing through as soon as we can so then you can return, and I will wire you, and then you can return the contract to the office'. We said we would do that. Then we asked him if we turned this contract down we would be in a position to rebid the next time. He says, 'if they send a set of bid sheets', he says, 'you are in a position to bid the job again'."

Mr. Baldock was not called as a witness on the trial, and the foregoing testimony stands undisputed. It will be noted that at that time Mr. Baldock did not tell defendants that their bid was to be accepted and the contract awarded to them. In the light of other facts now to be mentioned, that is highly significant.

We advert now to the activities of Mr. Paxson after his discussion with the defendants heretofore referred to. On April 28, 1950 (the day Cohn telephoned to Baldock for an appointment), Paxson left by train for Washington, D. C. On Monday and Tuesday, May 1 and 2, Paxson conferred with the officials of the U. S. Bureau of Public Roads. The Bureau refused its approval of the plans and specifications for the piers upon which the bids opened on April 24 were based, and insisted upon a change as a condition of granting Federal aid. The changes demanded by the Bureau referred to the size of the footing and number of piling under the foundations of piers numbered 2, 3 and 4. On May 2, Paxson agreed with the Bureau that the necessary changes would be made in the plans and specifications as demanded. Paxson, on May 2, telephoned his offices in Salem and directed his subordinates to immediately proceed with the change in plans and specifications. (This was the day that Cohn and Hart were conferring with Mr. Baldock.)

Under date of May 5, 1950, the Bureau of Public Roads, Oregon District, addressed a letter to Mr. Baldock confirming the changes to be made in the plans and specifications as discussed in a telephone conversation between that office and Mr. Baldock of date May 3 and, as a part of that letter, stated:

"Since our telephone conversation we are in receipt of additional information from our Washington office under date of May 2nd as follows:

" 'At a conference between Mr. Paxson and Bridge Branch engineers, the latter agreed to modify their recommendations contained in our memorandum of May 1 as follows:

Pier 2—Footings to be 12' x 12'

Pier 3—Footings to be 45' x 45'

Pier 4—Footings to be 18' x 21'

Pier 5—Footings as shown on plan.

"Mr. Paxson states that these changes will require some modification of contractor's lump sum bid for cofferdams. If necessary the number of piles under Pier 4 will be increased'."

On May 5, and without any action by the Highway Commission itself except as shown in the minutes of its meetings of April 24 and 25, supra, Mr. Baldock wired the defendant Construction Company as follows:

"Pursuant to authority given me by the State Highway Commission, I Goday [sic] award you contract for construction of Bridge pirs [sic] for proposed Marion Street Bridge in Salem at amount of your offer submitted to this commission on April 24, 1950, namely One Hundred Seventy-two Thousand Six Hundred and Ninety-Nine dollars. Contract and bond forms are being forwarded you today for execution. Please expedite return."

On the same day Mr. Baldock addressed a registered letter to the defendant Construction Company, con-

firming the above telegram, and forwarded contract and bond forms under separate cover.

On May 6, 1950, defendant Construction Company wired Baldock as follows:

"Your telegram of 5/5/50 received stop As per our letter of April 28 1950 we are unable to accept award due to error in our bid."

By letter dated May 6, addressed to Mr. Baldock, the defendant confirmed the sending of its telegram, supra, and under date of May 8, wrote the Highway Commission as follows:

"We are returning to you, by separate mail, contract and bond forms which you mailed to us for signature.

"As per our telegram of May 6, 1950, we are returning these forms, unsigned. We are forced to return the contract because of an error in our bid.

"We would appreciate it if you could see your way clear to return our bid bond to us."

When the plans and specifications had been changed to meet the demands of the Bureau of Public Roads, new bids were called for based upon the new plans and specifications. Forms for bidding were forwarded to the defendant State Construction Company, as to other bidders, together with the new plans and specifications. The bids were to be opened on May 26, 1950.

At the meeting of the Commission on May 25, according to its minutes, the following occurred:

"Alfred H. Cohn, President of State Construction Company, Seattle, to whom the Commission awarded the contract for the construction of piers for the proposed Marion Street Bridge in Salem, appeared before the Commission in company with his attorney, Mr. E. C. Hart, regarding this project. Mr. Cohn recalled that their offer submitted at the

previous meeting was $60,000 below the next low bidder. He said that a review of their calculations revealed a gross error and his company stands to lose considerable money if it undertakes to do the work at the price quoted, so they have decided not to accept the award, particularly in view of the fact that the State Highway Department would not consider a compromise arrangement. He asked the Commission to relieve the company of payment of the penalty under his bond, and to return the bond to them. Chairman Chandler advised that the Commission cannot, in good faith and fairness to other bidders, return the bid bond; moreover, it would not be in conformity with past policy of the Commission. *He expressed regret that the mistake was made* and pointed out that the delay in getting the work underway very likely will result in considerable extra expense to the state. The Highway Commission, he said, is not responsible for the mistake and has no alternative but to declare the company in default and to order recovery of the amount of the bond. He added that if the Commission took any other action it would jeopardize its future position in cases of similar nature. * * *" (Italics ours.)

It is significant that the Commission recognized that a mistake had been made by the defendant Construction Company, and that it did not question that it was an honest mistake. In fact, on the oral argument in this court plaintiff's counsel conceded that the good faith of defendants was in no way questioned.

On May 26, 1950, the bids, based upon the new plans and specifications, were opened and were as follows:

State Construction Company ............. $228,282.00
Lee Hoffman ............................................. 246,570.00
General Construction Company ....... 250,320.00

Although the State Construction Company was the lowest bidder and had entered its bid pursuant to the

invitation of the Commission when it furnished defendant with the necessary proposal forms and plans and specifications, its bid was rejected simply because of the difficulty arising in connection with the first bid. The bid of Lee Hoffman, the next lowest bidder, was accepted, although the amount of his bid was $18,288 more than that of defendant.

The Bureau of Public Roads was dissatisfied with the award of the contract to the second low bidder and demanded that all bids be rejected and new bids be called for. The Commission refused to accede to this demand and, as a result, the Bureau withdrew all Federal aid to the project and the state paid the entire cost.

To complete our statement of the facts in this case, it is important to note that the bid of the defendant Construction Company was not an unbalanced bid. Mr. Paxson testified:

"* * * I can say that that total bid on this project is lower than I had anticipated getting.

"Q. Some $70,000 lower than you anticipated? A. That's right.

"Q. Now, the question that I have is do you find any indication at all as an experienced engineer who has had a long experience in comparing bids for this very purpose, do you find any indication at all that this was an unbalanced bid on which the contractor bid purposely low on this item before he spread it out over one or more other items and made up for it or attempted to make up for it by an unbalanced bid? A. No, I don't think that there is any indication that he has unbalanced his other quantities.

"Q. Sometimes that is done by higher bidding contractors sometimes using an unbalanced bid; do they not? A. That is occasionally done.

"Q. But you find no evidence of it here at all, do you? A. No, I do not find any evidence of unbalance."

Plaintiff commenced its action to recover on the bid bond of the defendant Construction Company, the amount demanded being five per cent of the amount bid. In their answer setting forth their equitable defense, defendants prayed for a decree canceling the bid and bid bond, relieving the Construction Company from all liability under its bid and bid bond, and dismissing plaintiff's complaint and cause of action. By its decree the trial court awarded the relief prayed for by defendants.

As a part of his findings of fact, the able trial judge found:

"XIII. That the defendant, STATE CONSTRUCTION COMPANY, made an honest mistake in a basic and material figure in its bid and same was free from culpable negligence on the part of the defendant, STATE CONSTRUCTION COMPANY; that said mistake was apparent on the face of the bid of the defendant, STATE CONSTRUCTION COMPANY, when compared with the bids of the other bidders and with the estimate of the engineer of the STATE HIGHWAY COMMISSION, the plaintiff herein, for the estimated cost of said project; and that there was no meeting of the minds between the defendant, STATE CONSTRUCTION COMPANY, and the plaintiff; that the plaintiff was aware of the mistake which was made by the defendant, STATE CONSTRUCTION COMPANY, prior to its award of the contract, and that the plaintiff had been notified, both orally and in writing, of the mistake.

"XIV. That the plaintiff had not changed its status quo from the opening of the bids and the plaintiff has not suffered any damage by reason of the mistake of the STATE CONSTRUCTION COMPANY in no [sic] including the sheet piling cost in its bid.

"XV. That the defendant, STATE CON-STRUCTION COMPANY, acted promptly in notifying the plaintiff of its mistake."

■ The record amply supports these Findings of Fact.

Defendants contend that when the plaintiff made a change in the plans and specifications and called for new bids, it abandoned all proceedings in connection with the first bids, and that, inasmuch as defendant Construction Company's bid had not been accepted at the time the change in plans and specifications was agreed upon, its bid was without further force or effect. Plaintiff maintains that it could have entered into the contract with defendants based upon the original plans and specifications and have accomplished all the purposes of the new plans and specifications under the following standard provision of all its contracts:

"The right is reserved by the State, without impairing this contract, to make such increase or decrease in the quantities of the work as may be considered necessary to complete fully and satisfactorily the structures included in this contract. The compensation to the contractor for such increases or decreases shall be adjusted as provided elsewhere herein."

■■ We are of the opinion that this provision is applicable only when and after a contract has been entered into and does not contemplate any change in plans and specifications upon which bids were submitted prior to formal execution of a contract. In other words, authority is not given to the Commission to call for bids upon one set of plans and specifications and then force the bidder to accept a contract based upon other or different plans and specifications.

However, it is unnecessary for us to further discuss this phase of the case in this opinion.

■ Under the facts and circumstances of this case, defendants were clearly entitled to relief from the mistake made in the bid. The facts in this case bring it squarely within the rules established in this state by *Rushlight Automatic Sprinkler Co. v. City of Portland*, 189 Or 194, 219 P2d 732.

■ The governing rule is well stated in 1 Story's Equity Jurisprudence, 12th ed, 135, § 138 (i), as follows:

"But where the mistake is of so fundamental a character, that the minds of the parties have never, in fact, met; or where an unconscionable advantage has been gained, by mere mistake or misapprehension; and there was no *gross negligence* on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress; and no intervening rights have accrued; and the parties may still be placed *in statu quo;* equity will interfere, in its discretion, in order to prevent intolerable injustice. This is the clearly defined and well established rule upon the subject, in courts of equity, both in England and America." (First italics ours.)

See also *Moffett, Hodgkins & Co. v. Rochester*, 178 US 373, 44 L ed 1108, 20 S Ct 957; *Hearne v. Marine Ins. Co.*, 20 Wall. 488, 22 L ed 395; *St. Nicholas Church v. Kropp*, 135 Minn 115, 160 NW 500; *Singer v. Grand Rapids Match Co.*, 117 Ga 86, 43 SE 755; *Union & People's Natl. Bank v. Anderson-Campbell Co.*, 256 Mich 674, 240 NW 19, 80 ALR 584; *Kutsche v. Ford*, 222 Mich 442, 192 NW 714; *Donaldson, et al., v. Abraham, et al.*, 68 Wash. 208, 122 P 1003; *Geremia v. Boyarsky*, 107 Conn 387, 140 A 749; *Board of School Com'rs of City of Indianapolis v. Bender*, 36 Ind App 164, 72 NE 154; *Hurst v. Natl. Bond & Inv. Co.*, 96 Fla 148, 117 So 792, 59 ALR 807; 3 McQuillin Mun. Corp., 2d ed, pp 1224, 1247; Note in 59 ALR commencing at p 809; Note in 80 ALR commencing at p 586.

■ It is well established that the gain to be derived by a forfeiture of the money represented by the bid bond, or by having to accept a higher bid, is not such a loss or injury as forms ground for denying equitable relief. In *Donaldson et al. v. Abraham, et al.,* supra, the Washington court said:

"The appellants in the case before us fall within the rule. By mistake and inadvertence, they put in a bid for a piece of work for a sum much less than they intended to bid for it, and for a sum much less than that for which the work could be performed without loss. The mistake was not due to their willful neglect; nor will the granting relief from the mistake cause the other persons interested any serious loss, other than they will be deprived of the gain to be derived from a forfeiture of the check. But this latter is not a loss or injury, within the meaning of the rule, and is not a ground for denying relief."

In *Kutsche v. Ford,* supra, the court said:

"In the instant case it may be thought that the school district cannot be said to be placed in statu quo when it is considered that the building cost nearly $6,000 more than plaintiff's bid. To place in statu quo does not mean that one shall profit out of the mistake of another. * * * To compel plaintiff to forfeit his deposit, because of his mistake, would permit the school district to lessen the proper cost of the school building at the expense of the plaintiff, and that, in equity, is no reason at all for refusing plaintiff relief."

In the instant case the defendant Construction Company made a serious and substantial mistake in its bid; it was an honest mistake, and not one that was intentional nor one due to gross negligence or willful neglect; immediately upon discovering the error, defendant advised plaintiff thereof and sought to withdraw its bid. The bid had not then been accepted nor

had the other bids been rejected. Plaintiff had in nowise changed its position because of the mistake. In everything it did defendant acted in good faith. It is manifest that it never intended to submit a bid without including therein the cost of the necessary steel sheet piling. When plaintiff assumed to accept the bid no meeting of the minds occurred. Particularly apropos to the situation present in this case is the language employed by Mr. Justice Rossman in the Rushlight case, supra, p 245 of 189 Or, as follows:

> "When the City officials [State Highway Commission] opened the plaintiff's [defendant's] bid they surmised [it must have surmised] that it was too good to be true. When they [it] went through the form of accepting it, they [it] knew that the paper in their [its] hands did not represent the plaintiff's [defendant's] intent. They [it] had no occasion to doubt the truth, which was apparent, that the paper, although it bore the plaintiff's [defendant's] signature, was not in fact the plaintiff's [defendant's] offer. When they [it] adopted their resolution [assumed to accept the bid], no meeting of minds occurred. At that time the City [Highway Commission] had not changed its status quo and had suffered no damage whatever. To be denied the privilege of taking advantage of another's mistake is not to suffer damage. The proposal of the Atkinson Company [Lee Hoffman], second low, was still available, and in fact was shortly accepted.
> "* * * * * *
> "It is our belief that although the plaintiff [defendant] alone made the mistake, the City [State Highway Commission] was aware of it. When it accepted plaintiff's [defendant's] bid, with knowledge of the mistake, it sought to take an unconscionable advantage of an inadvertent error. Equity is always prepared to grant relief from such situations."

The decree is affirmed with costs to defendants.