509 P.2d 1189 (1973)
SHOPPING CENTERS OF AMERICA, Inc., a Corporation, Respondent and Cross-Appellant,
v.
STANDARD GROWTH PROPERTIES, Inc., a Corporation, Appellant and Cross-Respondent.
Supreme Court of Oregon, In Banc.
Argued and Submitted on Rehearing January 8, 1973.
Decided May 17, 1973.
*1190 John R. Faust, Jr., Portland, argued the cause for appellant and cross-respondent. With him on the briefs were Cake, Jaureguy, Hardy, Buttler, McEwen & Weiss, Portland.
Francis E. Marsh and David C. Haugeberg, McMinnville, argued the cause for respondent and cross-appellant. With them on the briefs were Marsh, Marsh, Dashney & Cushing, McMinnville; David C. Haugeberg, McMinnville, argued the cause for respondent and cross-appellant on rehearing.
DENECKE, Justice.
We granted a rehearing to reconsider plaintiff's right to rescission of a land sale contract. We affirmed the decree of rescission in our former opinion on the ground that there had been a mutual mistake. The defendant contends that mutual mistake was not an issue in the case and that if it had been it could have introduced additional evidence that no mutual mistake had occurred. Plaintiff answers that mutual mistake was an issue and was proved.
Mr. Bright, president of the plaintiff, acted for the plaintiff in this whole transaction. He was an experienced real estate developer who previously developed property in Hawaii and Alaska. He became acquainted with this property while representing another party interested in exchanging its equity in a shopping center for the property.
Mr. Bright inspected the property and subsequently purchased an adjacent 87 acres. In July 1969 he moved into a home on that land. As he said, "All I had to do was look out the front door and I can see the whole 827 acres." He became interested in developing the 827 acres and negotiated with defendant for its purchase. In November 1969 the parties entered into the contract of purchase.
Plaintiff alleged three grounds for rescission in its complaint  fraudulent representation, innocent misrepresentation and breach of contract. The allegation of misrepresentation stated:
"(a) That in the tract of land, the subject of the sale hereinabove described and which was commonly referred to as Rancho Verde, there was 827 acres of rich farmland and recreational property with a potential of more than 90% return on the invested capital in less than two years.
"(b) That said 827 acres of Rancho Verde as above described could be subdivided into 5-10 acre ranchettes which were in great demand in the area where the Rancho Verde lands were located.
"(c) That the real property described in said contract (Exhibit `A') attached hereto could be readily subdivided into lots and tracts and was suitable for a subdivision and complied with all the laws of the State of Oregon relating to subdivisions within the state and that similar land had been approved by authorities as subdivided tracts and had consistently sold for from $1,000 to $1,500 an acre.
"* * *
"The foregoing representations made to the plaintiff by the defendant were, in fact, at the time made, false and untrue in that said land could not be subdivided *1191 and was not rich farmland and recreational property and similar tracts had not been subdivided, and all of said representations at said time were false and untrue."
At trial the principal contentions of misrepresentation were that defendant represented that the property could be subdivided into 5- to 10-acre tracts and the plaintiff should have no trouble getting approval from the county planning authorities for subdividing the property. The evidence was that a brochure published by defendant's agent stated: "With the vast diversity of the land, Rancho Verde should be subdivided into 5-10 acre ranchettes * * *." Plaintiff's president testified defendant's agent told him there would be no problem getting Planning Commission approval of the use of septic tanks. This was the only evidence of representations by defendant.
Bright testified his original idea was to "cut it up into 150 five-acre tracts" with the remaining area, about 75 acres, to be held in common for duck ponds, horse barns, dog kennels, bird hatcheries, pool and lodge. When the winter rains came Bright saw that "several hundred acres" were under water; so he decided to divide about half the land into 2 1/2-acre tracts and to use the other half for the various improvements and recreational use.
Before Bright signed the contract with defendant, in November, he talked with the County Planning Commission about the proposed development and it had indicated it probably would have no objection, but the plan would be subject to the Health Department's approval. In February 1970 plaintiff had percolation tests run. These tests made it appear that septic tank use was feasible on the portion plaintiff wanted to develop. The County Planning Commission had employed such percolation tests previously to determine the feasibility of using septic tanks. On the basis of the favorable test results in this instance, the commission gave plaintiff tentative approval of the subdivision with 2 1/2-acre tracts on about 400 acres.
Sometime subsequently the Planning Commission was instructed by the State Health Department to consult with the Soil Conservation Service for inquiry into the feasibility of septic tank use. As a result of the Soil Conservation Service's study the area in which septic tanks could be used with the population density desired by plaintiff was reduced an undetermined amount.
In June the Planning Commission tentatively approved the amended proposal of plaintiff. Plaintiff never submitted any final plan to the commission. Plaintiff states that it could not submit any final plan because its contract with defendant required defendant's approval of its subdivision plans and defendant failed to approve.
The trial court, without stating any reasons, found for the defense on the fraud and innocent misrepresentation counts. The plaintiff never has urged at any stage of the appeal that the trial court erred in this respect and we will not further consider misrepresentation.
This is a suit in equity to rescind and we, therefore, review de novo. We held that mutual mistake was in issue and found that the parties were mutually mistaken in their belief that 750 acres of the 827 acres could be subdivided and that this mistake "so frustrated the purposes of the contract for the subdivision and development of the tract as to justify a rescission of the contract." After further examination of the puzzling record and further briefs and oral argument we conclude that we were in error and we find that there was not such a mutual mistake as would justify the rescission of the contract.
A contract may be rescinded if the parties enter into it through a mutual mistake on their part. Both parties must be mistaken. "[M]istake means a state of mind that is not in accord with the facts." 2 Restatement 958, Contracts § 500. The mistake must be fundamental in character. Highway Comm. v. State Construction Co., 203 Or. 414, 435, 280 P.2d 370 (1955). Stated differently, "Mistake Must Relate *1192 to Fundamental Assumption. It is often said that a mistake, in order to justify rescission, must relate to the intrinsic nature of the bargain * * *." 13 Williston, Contracts (3d ed.) 94, § 1544.
The only evidence that defendant entered into the contract in a mistaken belief about the number of acres that could be subdivided was a statement in the brochure of the realtor representing defendant, which was: "With the vast diversity of the land, Rancho Verde should be subdivided into 5-10 acre ranchettes * * *." We said in our opinion that defendant conceded at oral argument "that a mutual mistake existed * * * in that both parties * * * assumed and understood that most of the entire tract of 827 acres could be subdivided when, in fact, more than one half of the tract was so low that it was not suitable for subdivision." 498 P.2d at 784-785. But counsel for defendant merely said that the parties "contemplated" they could subdivide more lots than they actually could. It is doubtful whether the evidence preponderates to the view that defendant was mistaken in any material or substantial way on the amount of acreage available for subdivision.
More important, we find the evidence preponderates to the view that the number of acres available for subdivision for homesites did not relate to "the intrinsic nature of the bargain." Off hand, this seems like a specious observation, but we believe it is correct as it relates to this particular property and plaintiff's plan for development.
The plaintiff did not testify that the property was worth less because it had less space for homesites than Bright had originally anticipated. When Bright bought the property the evidence is that he contemplated selling 5-10 acre homesites and having about 77 acres as a community area with horse barns, riding stable, duck lakes, swimming pool, lodge, etc. When he saw in the winter that more land was water soaked than he anticipated he changed the details of his plan but not the basic concept. He testified: "* * * [S]o, I didn't change the concept of Palomino Farms a bit, I just decided to do the recreational areas in spades; instead of four duck ponds, let's dig up five or ten duck ponds * * *." Instead of proposing that each homesite owner fulfill his urge for open space by having 5 to 10 acres surrounding the house and the use of a few acres in common with his neighbors, plaintiff was going to accomplish the same purpose by drastically reducing the size of the homesites but drastically increasing the size of the common area.
Bright liked the changed development better than the original. He testified: "We still felt it saleable, ultimately; the quality of the product we were going to merchandise was better than the original idea." He reiterated that the final plan using only 307 acres for homesites "actually made it a more attractive and more marketable product."
We were also bolstered in reaching a decision that there was a mutual mistake by the belief stated in our opinion that more than half the tract was not suitable for subdivision and the county authorities would approve the subdivision of only 307 acres. Upon further examination of the entire record we find our belief was not completely correct. There is no evidence how much of the property was water soaked in the winter. Mr. Bright testified "several hundred acres of this land had a water table sitting on top of the ground." The engineer engaged by plaintiff was not asked to determine how much land would be flooded by surface water.
The Planning Commission approved substantially more than 307 acres for homesites using septic tanks, although, in some of these areas a density of one family per 10 acres was required. However, Mr. Bright by this time had decided he wanted to concentrate the homesites and have roughly 500 acres as a recreational area.
We were also of the opinion initially that a mutual mistake of the amount of acreage available for homesites was material *1193 because it rendered the acreage release provision of the contract unworkable and frustrated the purpose of the contract. Further dissection of the problem convinces us we were mistaken.
Plaintiff was purchasing the 827 acres by contract. To provide security to the defendant-seller but to grant the fee of the homesite to its purchasers, the plaintiff proposed an acreage release provision in the contract which was acceptable to defendant. Under the provision, when the plaintiff sold a parcel, plaintiff would pay $750 per acre to the defendant and the defendant would deliver a deed for this parcel. The payments to defendant would be credited on the balance of the purchase price. The principal balance was $360,000 and the sale of slightly less than 500 acres would pay the balance.
With the plaintiff now going to sell homesites on only 307 acres, $750 per acre would produce substantially less than $360,000. When we considered the problem after argument on rehearing we were troubled to determine how reducing the number of acres to be sold for homesites and thereby reducing the acreage release payment was prejudicial to the plaintiff. It appears that the defendant would be the party who had cause for complaint. All the homesites would be sold and the plaintiff would still owe a substantial balance on the principal. It now appears that plaintiff's reason for seeking a new acreage release provision was that plaintiff changed its concept of ownership of the common area.
The acreage release provision proposed by plaintiff and adopted in the contract provided that when defendant had been paid $100,000 on the principal it would convey the common area, referred to as the "community area," to plaintiff.
In February 1970 plaintiff's attorney suggested a complete change in the security to be accorded defendant when plaintiff sold tracts. Instead of the acreage release provision already described, the attorney suggested defendant convey the entire 827 acres to plaintiff and rely upon other devices for security. A purchaser from plaintiff would receive not only title to his building site, but also an undivided interest in the common area. The development would be a condominium; that is, under "unit ownership." ORS 91.505 et seq. The attorney estimated these units would sell for $10,000.
This apparently was unacceptable to defendant. In plaintiff's last demand on defendant to modify the contractual release provision, plaintiff dropped the request that the defendant convey the entire 827 acres and accept some other security. However, plaintiff continued to propose that when it made a sale and paid a portion of the price to defendant, defendant would convey not only the building site sold, but an undivided interest in the common area. When defendant rejected plaintiff's proposed plan it stated: "The plan as submitted is not acceptable to us primarily because in our opinion it would result in impairing our security interests due to the excessive utilization contained in the plan for common areas."
If plaintiff had not changed its ideas on ownership of the common area the original lot release plan would not have been unworkable for plaintiff although it would have furnished much less security for defendant. Plaintiff would ultimately have sold 307 acres for homesites and paid defendant $750 per acre, a total of about $230,000, with $130,000 remaining owing on the principal.
We conclude that we were in error in our original decision and that there was no mutual mistake justifying a rescission of the contract.
The trial court decreed rescission upon the ground that the defendant had breached the contract by refusing to approve the plans for subdivision and this was a ground for rescission. The contention of the plaintiff on appeal was that the trial court was correct in this assessment of the facts. The defendant contended, in essence, that there was no breach of the *1194 contract because all plans submitted for defendant's approval included a proposed modification of the contract and it is not a breach of contract to refuse to modify an existing contract.
We did not decide this issue in our original decision. We now conclude that the defendant did not breach the contract.
The "Acreage Release Provisions" of the contract provided, in part: "Purchaser agrees to submit in writing to Vendor for its written consent and approval all plans and specifications in connection with subdividing, partitioning or otherwise developing for recreational or residential purposes or otherwise the property * * * it being understood that such submission and approval shall be prior to purchaser's offering said property for sale."
The plaintiff submitted to the defendant for approval the plan the Planning Commission had tentatively approved, along with a proposed amended acreage release provision. Defendant did not respond until its rejection crossed in the mail with plaintiff's demand for rescission. Defendant stated in its rejection letter: "2. This will confirm our rejection of your prior requests for modifications or amendments of the above captioned lot release program contained in said contract."
We find the evidence is clear that an integral and essential part of the plan submitted to defendant for approval was a change in the acreage release provision of the contract and that approval of the subdivision plan alone, without also consenting to a change in the contract, would have been of no value to plaintiff. Plaintiff argued exactly that and stated in its brief: "To separate the lot release provisions from the subdivision plans would be to completely ignore the realities of subdivision and the requirements and provisions of the contract."
Plaintiff admits that ordinarily the refusal of a party to a contract to agree to an amendment is not a breach of contract. It contends here, however, that defendant had an obligation to agree to a modification because the contract was "based upon defendant's representations." Plaintiff argued in its brief on petition for rehearing that it was entitled to relief from the lot release provision because such provision was agreed to because of mutual mistake.
We have already explained we will not review the trial court's dismissal of the fraud and misrepresentation counts since plaintiff has not claimed the ruling was incorrect. We have found that the parties did not enter the contract because of a mistake of any fundamental character. Therefore, this case is not an exception to the rule that a party is entitled to stand on its contract as written.
Plaintiff also contended defendant breached the contract by failing to furnish title insurance as provided by contract:
"Vendor shall furnish at his expense a Purchaser's title insurance policy in the amount of $475,000.00 within ten days from the date hereof insuring Purchaser against loss or damage sustained by him by reason of the unmarketability of Vendor's title, or liens or encumbrances thereon, excepting matters contained in usual printed exceptions in such title insurance policies and further excepting liens and encumbrances of record as of the date hereof."
The facts are that the policy was ordered on a date unknown. The policy was not mailed by the title company until December 3, 1970. It bears the effective date of December 31, 1969, which is the date when the contract between the parties was recorded. Title policies are usually issued as of the date of the recording of the contract. A preliminary report had been issued at an unspecified time. When the contract was recorded the title examiner noted that the description in the contract and, therefore, that in the policy, omitted a reference to two section numbers and, accordingly, it was incomplete. The title examiner suggested that the description in the contract be completed in this regard, the contract recorded, and then the description in the policy be completed. *1195 Nothing was ever done and the policy issued has the incomplete description.
A breach of contract in order to substantiate a rescission must be substantial. "Rescission is not warranted when the breach is not substantial and does not defeat the objects of the parties." Bollenback v. Continental Casualty Co., 243 Or. 498, 506, 414 P.2d 802, 806 (1966). The failure to furnish a title policy within 10 days or to furnish one with a complete description is not a substantial breach defeating the objects of the parties.
The decree of the trial court is reversed. The defendant counterclaimed for foreclosure because plaintiff had not made the payment due on the contract. The suit is remanded for the trial court to enter a decree in accordance with this opinion and enter a decree deciding the issue raised by defendant's counterclaim for foreclosure.
McALLISTER, J., concurs in the result.
TONGUE, Justice (dissenting).
I respectfully dissent for the same reasons as stated in my original opinion in this case.
HOLMAN, J., joins in this dissent.