Chet L. PARKER and Lois M. Parker, Appellants,

v.

TITLE AND TRUST COMPANY, a corporation; Paul Winans, Ethel Winans, Ross M. Winans, Audubon Winans and Linnaeous Winans, Appellees.

Walter STEGMANN, Appellant,

v.

TITLE AND TRUST COMPANY, a corporation; Paul Winans, Ethel Winans, Ross M. Winans, Audubon Winans and Linnaeous Winans, Appellees.

No. 14201.

United States Court of Appeals
Ninth Circuit.

May 4, 1956.

Cake, Jaureguy & Hardy, Nicholas Jaureguy, Portland, Or., for appellants Parker.

Phillips, Coughlin, Buell & Phillips, James K. Buell, Hart, Spencer, McCulloch, Rockwood & Davies, Manley B. Strayer, Cleveland C. Cory, Portland, Or., for appellee Title & Trust Co.

Krause, Evans & Lindsay, Dennis Lindsay, Portland, Or., for appellees Winans.

Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

The above named Title and Trust Company, an Oregon corporation, brought this action against the appellants Parker and Stegmann, citizens of the State of Washington, seeking, among other things, the cancellation of certain policies of title insurance issued by the company, based upon allegations that the Parkers had obtained the policies through fraudulent concealment of certain facts alleged to have been material to the risk assumed in the policies. In general the claim was that when the Parkers obtained the policies insuring the title to the lands described therein, they had knowledge that the title to one of the two parcels described was not good since ownership thereof was in the United States; and that the policies were procured through fraudulent concealment of that fact and of their knowledge thereof. The appellees Winans, brought in as third party defendants on complaint of the company, also recovered a money judgment against Parker and Stegmann upon their cross-complaint. The Parkers and Stegmann have appealed.

The trial court found that in the summer of 1951 Stegmann negotiated with third party defendant Paul Winans for the purchase of lots 1 and 2 in a certain section 16 in Hood River County, Oregon. Stegmann was carrying on those negotiations as agent for the defendants Parker who were his undisclosed principals. Paul Winans was acting for himself and other members of the Winans family. Although the Winans' predecessor in interest had received a deed for lot 2 from the State of Oregon, which the State had executed on the assumption that it had acquired title to that portion of section 16 as school lands, and although these predecessors in interest had conveyed lot 2 to the Winans, yet at the time of the negotiations mentioned, title to lot 2 remained in the United States, since prior to its survey[1] it had been withdrawn as a portion of the Mount Hood National Forest. Although the State had many years previously selected other lands in lieu of lot 2 and had offered to return to Winans the consideration previously paid for lot 2, yet that lot as well as lot 1 was carried on the tax rolls of Hood River County, and taxes thereon were levied and paid by Winans through the year 1951. Hence information that lot 2 was owned by the United States was not available from any records within Hood River County during the year 1951.

However, the Winans knew where title to lot 2 lay. They had initiated efforts to obtain congressional legislation which would pass title to them, but in 1943 they had obtained from another title company a policy of insurance on these two lots. At that time the government's claim of ownership to lot 2 resulted in Winans filing a claim for loss with that title company on account of the unmarketability of the title and this claim was settled by payment of a substantial sum by the title company. Winans made a full disclosure to Stegmann of all these circumstances.

Thus, as these negotiations proceeded and eventuated in a conveyance from Winans, Stegmann knew not only about the state of the title but about the unfortunate experience of the former title company in having first insured the title to lot 2 and then having to pay a loss because of this same defect. Stegmann proceeded to take an option from Winans in his own name for which he paid $1000 and which called for conveyance of Winans' interest in both Lot 1 and Lot 2 for a total consideration of $100,000. In company with Parker he visited a Forest Service Ranger's office where full information was given both men as to the defective title to Lot 2.

Parker then applied to the plaintiff for a title report and received such report showing good title to be in the Winans. Stegmann then made a second payment on the option which amounted to an election to purchase. He executed a pur-

---

1. It was held in United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599, that lands in Section 16 did not pass to Oregon until survey was completed, and that until then they could be withdrawn.

ported assignment of this option to Parker. It recited a consideration of $25,000. Upon Parker's presentation to the plaintiff company of evidence of the option agreement and of this assignment, it issued to the Parkers a purchaser's policy of title insurance in the amount of $125,000 and agreed to replace this with an owner's policy in the same amount, when purchase was completed. The payment of the option price was completed and deed from Winans to Chet L. Parker delivered and recorded. Plaintiff then learned from a Forest Service representative that the United States claimed title to lot 2. Confronted with this, Parker falsely assured plaintiff he knew nothing of it. Relying on that assurance the Company issued its owner's title policy as it had agreed to do. Thereafter, still falsely claiming that Winans had not divulged to them any defect in the title, and falsely claiming also they had paid $125,000 for the property, the Parkers proceeded to present a claim of loss to the Company. The Company then filed this action asking cancellation of their policy.

### The Judgment for Title & Trust Company

 The Parkers challenge the findings of the trial court that they had knowledge both individually and through their agent Stegmann of the defect in the title to lot 2 at the time they applied for and procured the title policy. With respect to this contention, it need only be said that the trial court's findings upon this point are supported by sufficient evidence.[2] While the Parkers and Stegmann denied possession of this knowledge, the trial court did not believe them and of course it is no part of our function to review their credibility.

 The principal contention of the Parkers is that if, as the court found, they had knowledge of the defect as to the title when they purchased the policy

from the plaintiff company, they were under no obligation whatever to make any statement or disclosure with respect thereto. The argument is that it was part of the business of the company to examine and insure titles; that the Parkers had no fiduciary or other duty toward the company such as would require disclosure of information to it and hence that no grounds have been established which would warrant a decree cancelling the policy. Appellants assert that the rule of law here applicable is that which was stated in Frederick v. Sherman, 89 Or. 187, 173 P. 575, where the court approved language quoted from Bigelow on Fraud to the effect that as a general rule silence alone is not unlawful in transactions between persons dealing at arm's length no matter how great an advantage may be gained thereby. In the language of the quoted extract: "But, speaking of pure silence, the general rule stated is very strong. It governs even though the silence was meditated, and with knowledge that the opposite party was laboring under mistake or ignorance." So the Parkers argue, since no affirmative representations were made by them to the Title Company, there was no actionable fraud present. They say that the very purpose of going to the Title Company was to learn from an expert whether the title was clear.

We think that there are several reasons why the rule of Frederick v. Sherman, supra, is not controlling here. In the first place, the Title Company clearly acted under a mistake of fact and in ignorance of the very material lack of title to lot 2. This was a case of unilateral mistake, but the mistake was known to the Parkers who were fully aware that it concerned a matter so vital that the policy would not have been issued were it not for the mistake. The Supreme Court of Oregon has held that under such circumstances a contract is subject to cancellation in equity.

---

2. Directly contradicting the Parkers and Stegmann were Winans, the Forest Service employees, and sundry other seemingly disinterested persons. Much of the testimony given by appellants was self-contradictory and otherwise impeached by documentary evidence.

In the case of Rushlite Auto. Sprinkler Co. v. City of Portland, 189 Or. 194, 219 P.2d 732, 753, the Oregon court exhaustively discussed the question of the right of a party to cancellation of a contract executed under his own mistake, but which was known to the other party. Said the court in dealing with an acceptance of an offer where the offeror made a material mistake in making it: "But if the offeree knew of the mistake, and if it was basic, or if the circumstances were such that he, as a reasonable man, should have inferred that a basic mistake was made, a meeting of the minds does not occur." In arriving at its conclusion that such is the law of the State of Oregon, the court not only reviewed many decisions from other States, but quoted from Williston on Contracts, and from the Restatement of the Law of Contracts and Restitution. From § 12 of the latter Restatement, the court quoted the following Reporter's Note: " 'Where one party knows or has reason to know that the other party has made a basic mistake (see Comment c) restitution is granted.' " [3] This court had occasion to allude to the same rule in United States v. Jones, 9 Cir., 176 F.2d 278, 285.

 The court found that the company's failure to discover this defect of title was negligence on its part. Appellant argues that this negligence prevents the company from claiming relief by way of cancellation here. We are of the opinion that the law does not sustain that contention. § 59 of the Restatement of the Law of Restitution recites: "A person who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to his lack of care." It appears to be well established by the Oregon decisions that the negligence which will bar equitable relief on account of mistake must be

something more than mere ordinary negligence or negligence of the sort chargeable to the title company under the record in this case.

This question is thoroughly discussed in the case of Wolfgang v. Henry Thiele Catering Co., 128 Or. 433, 275 P. 33, 36. In that case the court quoted from its earlier decision in Howard v. Tettelbaum, 61 Or. 144, 120 P. 373, the statement of the rule that " 'negligence, in order to bar equitable relief, in case of mutual mistake, clearly established, must be so gross and inexcusable as to amount to a positive violation of a legal duty on the part of the complaining party.' " The court also quoted with approval statements of the same rule as expressed in treatises on the subject of "Equity" in legal encyclopedias. From 21 C.J., p. 88, § 64(c), it quoted: " 'Even gross negligence has been held insufficient to prevent relief for a unilateral mistake made with the knowledge of the other party.' " It approved the statement from 10 R.C.L. Equity, p. 296, § 40, that: " 'The conclusion from the best authorities seems to be, that to constitute culpable negligence the neglect complained of must amount to the violation of a positive legal duty.' "

The Oregon court's views of the type of positive legal duty whose neglect might give rise to culpable negligence was expressed by the court in Welch v. Johnson, 93 Or. 591, 608, 183 P. 776, 184 P. 280, at page 281, as follows: "[T]he negligence which will prevent the relief of a party from his mistake must be such as will amount to a violation of a positive duty *owed to another party.*" (Emphasis ours.) It is plain that the view of the Oregon court is similar to that stated in Dixon v. Morgan, 154 Tenn. 389, 285 S. W. 558, 562, as follows: "All negligence, to be culpable, necessarily implies the failure to perform some duty. * * *

3. See also Restatement on Restitution, § 8, under Comment (b): "Likewise, a person who, before the transaction is completed, knows or suspects that the other is acting under a misapprehension which, if the mistake were mutual, would cause

the transaction to be voidable, is under a duty to disclose the facts to the other." Also see annotation: "Unilateral mistake as basis of bill in equity to rescind the contract," 59 A.L.R. 809.

It is not a failure of duty to one's self, but to another, that constitutes culpable negligence."

This view, that relief based on mistake is not barred by mere negligence,[4] but that before such relief may be denied there must be *culpable* negligence, arising out of the violation of a positive duty owed to another party, found practical application in Rushlite Auto. Sprinkler Co. v. City of Portland, supra. In that case the mistake consisted of Rushlite's failure to include in its bid any amount for steel required in a city sewer on which it was bidding. It had obtained the quotations on steel prices from a dealer the day before the bid was filed. It forgot to include them; yet the court granted Rushlite relief by way of cancellation, approving the trial court's finding that the mistake was "not culpable."[5]

There is no finding of gross or culpable negligence here, and it is manifest that there could not be such under the facts of this case, for in overlooking the title defect the company was not violating any duty it owed to the Parkers. Under the facts as found by the trial judge the Parkers, after first learning of the successful collection of damages on a prior title policy from another company, laid a trap for this company by getting its title report and then, perceiving that the company was ripe for taking, proceeded to spring the trap by procuring the policy and then demanding payment thereunder. Surely a person thus led into a trap owes no duty to the one who did the trapping.

Another reason why we think that the rule of Frederick v. Sherman, supra, is not applicable to the facts of this case, is that whatever may be the rule respecting the right of a contracting party to remain silent concerning material facts known to him and which he knows are unknown to the other party, yet if he undertakes to make some statement respecting the matter, he cannot indulge in half-truths. The rule is stated in Pohl v. Mills, 218 Cal. 641, 24 P.2d 476, 481, as follows: " 'Though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a full and fair disclosure.' " In the language quoted in Frederick v. Sherman, supra [89 Or. 187, 173 P. 576], from Bigelow on Fraud, it is noted that the sort of silence which merely " 'keeps back part of a truth told or suggested * * * is nothing else than misrepresentation' ". And in Dahl v. Crain, 193 Or. 207, 237 P.2d 939, 947: " 'A partial and fragmentary disclosure accompanied by wilful concealment of material and

---

4. The very fact that a party has made a mistake suggests lack of care on his part. As stated in Institute Bldg. & Loan Ass'n v. Edwards, 81 N.J.Eq. 359, 86 A. 962, 965: "It is indeed difficult to conceive of any form of equitable relief from mistakes where some degree of negligence of the party seeking relief is not involved."

5. In the later case of State Highway Comm'n v. State Construction Co., 203 Or. 414, 280 P.2d 370, 380, the court in commenting upon its rule in the Rushlite case, suggests that relief on the ground of mistake is not barred by anything less than gross negligence. The court quoted with approval the following language taken from Story's Equity Jurisprudence: " 'But where the mistake is of

so fundamental a character, that the minds of the parties have never, in fact, met, or where an unconscionable advantage has been gained, by mere mistake or misapprehension; and there was no *gross negligence* on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress; and no intervening rights have accrued; and the parties may still be placed *in statu quo;* equity will interfere, in its discretion, in order to prevent intolerable injustice. This is the clearly defined and well established rule upon the subject, in courts of equity, both in England and America.' " (The emphasis of the words "gross negligence" is that of the Oregon court.)

qualifying facts is not a true statement and is often as much a fraud as an actual representation.' " [6]

Here, in dealing with the Title Company, the Parkers undertook to make some disclosures respecting the proposed acquisition of the property and the property itself. They did not simply order a title policy covering the described property, but they undertook to outline some of the circumstances relating to the transaction. In applying for the preliminary report, the Parkers not only gave the company a memorandum of the description of the property but a memorandum stating that Winans was the record owner. When they received the title report they gave the company further information to the effect that their purchase of the property was subject to a timber cruise. When they applied for a purchaser's policy of title insurance in the amount of $125,000, they left with the plaintiff company an executed assignment of the option from Stegmann to Chet Parker, which assignment recited that $25,000 had been paid for the assignment. This was not even a half-truth for the court found that Parker did not purchase the option from Stegmann or pay him $25,000, or any other sum therefor. In fact, Stegmann had been the agent acting for Parker all along. The court also found that the assignment was a sham and the $25,000 mentioned therein a mere device to give color to a

request for a title insurance policy in the total amount of $125,000. Also, at the time of the application for the policy, it was represented to the title company that the valuation of lot 1 was $35,000 and the valuation of lot 2, $90,000. This also was less than a half truth for, as the court found, the Winans had placed a valuation of $80,000 on lot 1 and a valuation of $20,000 on whatever interest they might have in lot 2. Of course, the extent of their interest would be the possibility of procuring a recognition by Congress that they ought to have special relief legislation.

If this disparity in valuation had been disclosed, it might, we assume, have led to an inquiry as to why the lesser value was placed on lot 2. We think that the circumstances here are such that there was a " 'partial and fragmentary disclosure accompanied by wilful concealment' ", within the meaning of the rule stated in Dahl v. Crane, supra.[7]

Another reason why this case presents a situation differing from that in Frederick v. Sherman, supra, is found in the circumstances we have related concerning the deliberate setting of a trap for the title company. The findings describe this by stating that Parkers and Stegmann "entered into a conspiracy to defraud the plaintiff." Appellants are critical of this reference to a conspiracy, saying "the charge of 'conspiracy' adds nothing to the case." But we think this

6. This was a part of the court's extensive quotation from Corpus Juris and Amer. Jur. articles on "Sales", and "Vendor and Purchaser". The court also cited Palmiter v. Hackett, 95 Or. 12, 186 P. 581, 582, where it had said: "It is one thing to conceal, and quite another merely to remain silent; and concealment may rest upon partial statement and partial silence." See also the opinion in the Palmiter case at 185 P. 1105, 1106.

7. It is also the contention of the appellee, that since the parties were dealing here with a contract of insurance, the Parkers were under a special duty of disclosure which appellee argues is owed by an insured to his insurer. This is said to be a rule of special application to insurance contracts. As authority for

this rule there is cited Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895, where the court said: "Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." Appellee cites De Carli v. O'Brien, 150 Or. 35, 41 P.2d 411, 97 A.L.R. 693, to show that the title policy here was one of insurance. The special rule relating to insurance contracts to which appellee calls our attention is not one recognized by all courts and our attention has not been called to any Oregon case dealing with this situation.

overlooks the whole picture as found by the court.

It was in 1943 that the Winans procured their title policy from the other company. At the time they knew their title was questionable.[8] In 1944 they made their claim of loss, and they procured a settlement. The Parkers knew about this, and the question was, as they worked out their plans, could the same scheme be worked again on another company. To find out, they ordered the title report. This, as the court found "was a necessary element in the scheme." Now, under the circumstances here found, the request for the title report was more than a mere asking for information. It was of course an effort to find out if the company was unaware of the defect. But beyond that, it was an implied representation that the Parkers had no information as to the title. It was as though Jones, wishing to make Brown believe he did not know Smith (whom Jones knew well), pointed out Smith and said to Brown, "Who is that man?" We think the facts here warrant the conclusion that in requesting that report, Parkers were impliedly representing that they knew nothing about the title.

Viewed in this light, the case falls within the rule of Musgrave v. Lucas, 193 Or. 401, 238 P.2d 780. In that case the defendants had sold to the plaintiffs a tract of land adjoining a river upon which defendants had been carrying on the business of removing and selling sand and gravel. The complaint alleged that the plaintiffs had purchased from the defendants their sand and gravel operation and that the latter had fraudulently concealed from the plaintiffs the fact that they had received from the War Department a letter indicating that the Government was considering putting a stop to the gravel and sand operations as tending to interfere with the navigability of the stream. The complaint alleged that the defendants fraudulently represented to the plaintiffs that they knew of no reason why plaintiffs should not continue the operation of the sand and gravel business. The Oregon court said, 238 P.2d at page 786: " * * * It is evident that concealment of the fact that 'they had received any such letter' is quite material, and defendants, by their demurrer, admit they concealed this information with fraudulent intent and purpose." Holding that the complaint adequately alleged facts sufficient to sustain an action for fraud, the court said, at page 784 of 238 P.2d: "Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations. In 37 C.J.S., Fraud, § 16a, p. 244, it is said: 'An exception to the rule that mere silence is not fraud exists where the circumstances impose on a person a duty to speak and he deliberately remains silent. It is well settled that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation. Where the law imposes a duty on one party to disclose all material facts known to him and not known to the other, silence or concealment in violation of this duty with intent to deceive will amount to fraud as being a deliberate suppression of the truth and equivalent to the assertion of a falsehood.' "

The fraud here, like that in the Musgrave case, consisted in the implied representation that Parker knew of no reason why a title policy should not be issued.

We hold that so far as the right to a cancellation of the title policy was concerned, the law, as well as the facts, justify the court's conclusion that a case for cancellation had been made out.[9]

The appellants also specify as error the action of the court in admitting a large amount of evidence of former

---

8. The State had offered to return to their father and predecessor in interest the money the State had received for the lot.

9. The court also found that Parkers had breached a condition of the policy calling for disclosure of certain facts. We do not believe it necessary to consider that finding here.

transactions between the appellants Parker and the appellant Stegmann and of prior transactions between Parker and Stegmann on the one hand and third persons on the other. It is said that this evidence, which dealt with transactions which had no connection with the contract between the Parkers and the Title and Trust Company, were wholly irrelevant and merely *res inter alios acta*. It appears that the purpose of this evidence was to lend support to plaintiff's claim that Stegmann and the Parkers were operating together as agent and undisclosed principal. The evidence showed that when Stegmann made the first two payments under the option with Winans he did so by his own check drawn on a bank in which he had no account. The checks were paid out of Parker's account in that bank by Parker's direction. A $25,000 check was given to Stegmann in connection with his purported assignment to Parker, but the check was never cashed and was returned to the Parkers. The explanation given for this by Parker and Stegmann was that the check was given as a payment on a loan from Parker to Stegmann. The court found this explanation to be completely false, and the check in question to be a sham and fictitious. All this evidence about other dealings between and by Parker and Stegmann was apparently designed to further support the claim that they were working together on this deal. Perhaps this evidence showed nothing more than that the Parkers and Stegmann were well acquainted and accustomed to dealing together. Since the case was tried to the court sitting without a jury, we think that no prejudice can be claimed through the admission of this evidence of these other transactions.

### The Judgment for Winans

The Winans, brought into the action as third party defendants upon the complaint of the Title and Trust Company, in which they had been charged with fraud in falsely representing to Parker and Stegmann that they were owners of a marketable title to lot 2, proceeded themselves to file a counterclaim against the company and also against the defendants Parker and Stegmann. In the counterclaim it was charged that the Parkers and Stegmann, pursuant to their conspiracy to defraud the Title Company by concealing the knowledge they had obtained respecting the defects in the title to lot 2, maliciously and with intent to defame the Winans, told the company that the Winans had failed to disclose their knowledge of the defect in the title; that these malicious and defamatory statements were made with the intention and knowledge that the company would institute legal proceedings against the Winans and that this in fact happened through the filing of the charge in the third party complaint that the Winans had falsely represented that they had marketable title to lot 2. The Winans were awarded judgment against the Parkers and Stegmann upon this counterclaim. This judgment was based upon the finding of the trial court that when the plaintiff company learned from the Forest Service about the defect in the title to lot 2, the company advised the Parkers of that claim and the latter then falsely represented to the plaintiff company that they knew nothing of any claim of ownership by the United States. The court also found that the Parkers had represented that the Winans had not divulged to them any defect in this title or disclosed their knowledge of the Government's claim of ownership, but wilfully and intentionally induced the plaintiff to believe that the Winans had represented themselves to be the owners of this lot and to have good title thereto. It was found that these misrepresentations were material and made with the knowledge that the probable consequence would be such as to injure the Winans; that these representations constituted slander by imputing to the Winans the commission of a crime within the meaning of § 23–550, O.C.L.A. by having falsely represented that they were the owners of land to which they had no title. The court also found that all this resulted, as the Parkers knew it would, in the

institution of the legal proceedings against the Winans in which the latter were charged with making these false representations as to ownership of lot 2, with resultant adverse publicity, damage to their credit and reputation, and it required the Winans to incur expenses to defend themselves in these proceedings to which they were made parties, and to clear their names and reputations of the false imputation of crime and dishonesty cast upon them by Parker and Stegmann.

The Oregon statute, above referred to, reads as follows: "If any person shall falsely represent that he is the owner of any land to which he has no title, or shall falsely represent that he is the owner of any interest or estate in any land, and shall execute any conveyance of the same with intent to defraud anyone, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary not less than six months nor more than two years."

The theory upon which the trial court proceeded in giving judgment for the Winans against the Parkers and Stegmann, was that the representations made by the Parkers to the Title Company amount to a representation that the Winans were guilty of acts which were violative of this statute. Said the court: "A false statement which imputes a charge which, if true, would subject a person charged to indictment for a crime involving moral turpitude or subject him to infamous punishment is slanderous per se." [10] The court found that the Winans had suffered damages in consequence of these wrongful acts at least equal to the amount of the attorneys' fees which they incurred in defending the action. These amounted to $9,000 and this was the amount of the judgment awarded Winans.

The trial court alluded to the "paucity of decisional law" upon many of the questions involved and stated: "The most troublesome problem in this case is whether or not the Winans family is entitled to recover damages for slander against Parker." We have come to the conclusion that under the law of Oregon, the judgment in favor of the Winans against the Parkers and Stegmann cannot be sustained.

■ The wrongs which the Parkers are found to have committed against the Winans family all relate to the representations which the Parkers made to the Title Company during the course of settlement negotiations following the company's discovery of defect in the title. The court's opinion reflects what the record shows transpired during those negotiations. Proposed settlement contracts were drawn up for execution by the title company and the Parkers; these authorized the attorneys for the title company to commence and prosecute a suit in the name of the Parkers against the Winans to rescind the sale of the land. The Parkers objected to this provision and insisted that the company file suit against the Winans in its own name. The contracts were not signed but the third party complaint was filed against the Winans by the title company and in its own name in line with this insistence of Parker.

It thus appears that these representations by the Parkers which the court found to have been false, and to have amounted to representations that the Winans had not divulged any defect in the title, were made in connection with negotiations which contemplated the institution of an action against the Winans. The finding of the court was that the misrepresentations by the Parkers were made with the knowledge that "the probable consequences of such false representations made to plaintiff would injure third party defendants Winans." The finding also was that "Said representations by defendants Parker to plain-

---

10. Although the representations were made by the Parkers, the court found that the Parkers and Stegmann were collaborating in a conspiracy to defraud the title company and hence Stegmann was equally liable for the acts of the Parkers.

tiff concerning the third party defendants were made with the knowledge that the plaintiff would institute legal proceedings against the third party defendants, and that the third party defendants would be subject to adverse publicity * * * and would require them to incur expenses to defend such proceedings."

We infer that what was contemplated in the negotiations referred to in the court's findings was that a suit would be instituted such as the third party complaint, in the name of the title company but upon the theory of subrogation to the rights of the Parkers; and the Parkers, in the course of those negotiations were indicating that they stood ready to testify in connection with such an action that the Winans had falsely misrepresented their title. The question is whether such conduct on the part of the Parkers amounted to a wrong for which they may now be held liable in damages.

We think that the Oregon law, as laid down in Strycker v. Levell, 183 Or. 59, 190 P.2d 922, requires a holding that the statements thus found by the court to have been made by the Parkers, no matter how false and no matter how malicious, were absolutely privileged. In the Strycker case, the defendant Levell, who was engaged in litigation with his former wife over the custody of their infant child, made and filed an affidavit in the divorce suit, charging his wife with allowing his child to associate with the wife's mother, the plaintiff Strycker. The affidavit charged that Strycker was a person of low morals and set forth recitals of numerous instances of immoral conduct on her part. The other defendant, Peterson, was the former husband of Strycker. He also made an affidavit to the same effect which was also filed in support of Levell's motion. The court held that the language used in the affidavits of these defendants would constitute actionable libel if not privileged, but

that under the Oregon rule as established by other decisions there cited, the statements were protected under the rule of absolute privilege. The court said, 190 P.2d at page 925: "In substantial support of the Oregon rule we cite the Restatement, Torts, Vol. 3, §§ 587, 588, as follows: 'A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of a judicial proceeding in which he participates, if the matter has some relation thereto.' 'A witness is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding and as a part of a judicial proceeding in which he is testifying, if it has some relation thereto.' "

■ It is not important to determine here whether the Parkers should be regarded as parties to this litigation (by reason of the prosecution of a claim against the Winans to which the title company claimed to be subrogated), or whether they were prospective witnesses giving information as to their expected testimony [11] in support of the third party claim. In either case the privilege set forth in the Oregon court's decision, supra, would apply here and the privilege is an absolute one. As stated in the Strycker case, quoting from an earlier Oregon decision: " 'Neither is it material whether the defendant in making such statements was actuated by good or bad motives. The vital question is whether they were pertinent and relevant." There can be no question here but that what the Parkers said was both pertinent and relevant. As the privileged character of the language used appeared from the Winan's own case, it

---

11. It is to be noted that both of the sections quoted in the Strycker case from the Restatement of Torts, refer to communications " 'preliminary to a proposed judicial proceeding' ".

was unnecessary to plead privilege affirmatively. Taliaferro v. Sims, 5 Cir., 187 F.2d 6; Fed.Rules Civ.Proc. rule 15 (b), 28 U.S.C.A.

On behalf of the Winans it is argued that it is improper to say that any privilege exists here because properly considered the action of the Winans against the Parkers is not one for slander but rather a general action upon the case for wilful and malicious fraud and falsehood. They call attention to the numerous statements of courts and of legal writers to the effect that the intentional infliction of temporal damage always gives rise to a cause of action; that intentionally doing that which is calculated to damage is actionable if done without just cause or excuse. Thus they call attention to Art. 1, Section 10, of the Oregon Constitution which provides that " * * * every man shall have remedy by due course of law for injury done him in his person, property, or reputation." It is argued that Oregon is not averse to extending its common law to apply to remedies for the redress of acknowledged wrongs. It is suggested here that since what finally happened to Winans stemmed from the original conspiracy of Parker and Stegmann to defraud the title company, that this case is something more than a mere action to recover for slander or defamation. We are asked to apply the general principles expressed in the Oregon Constitution so as to sustain the so-called action upon the case in which judgment is said to have been entered here.

We are unable to believe that the Oregon court in this situation would be able to arrive at any different conclusion than that which it reached in the Strycker case, supra. In his work on Torts,[12] Dean Prosser has collected cases which he classifies under the heading of "Injurious Falsehood". These differ from the ordinary cases of slander or libel in that they involve the recovery for damages of a character different from that which ordinarily flows from slander or libel directed against a person. They too can be said to be actions on the case; but as the text accompanying those cases suggests those actions for injurious falsehood are subject to the same defense of privilege recognized in cases of personal defamation. This is particularly true in respect to the absolute privilege attaching to statements made in connection with judicial proceedings. As indicated in the Comments in the sections of the Restatement of Law of Torts which are cited in the Strycker case, supra, it is of fundamental importance in the administration of justice that witnesses and parties to suits should not be called to account in private suits for defamation (or in actions on the case for injurious falsehood) for what they have to say in connection with pending litigation. Were it otherwise, witnesses would seldom be available to litigants for they would be afraid to talk lest the litigant lose and the person about whom they talk then sue the witness for what he had to say.

The judgment is modified by striking therefrom the portion thereof in favor of the Winans and against the Parkers and Stegmann, and as so modified, the judgment is affirmed.

We judge that substantially one-tenth of the costs on these appeals were incidental to or occasioned by the appeal from the Winans' judgment; hence it is ordered that the appellants recover one-tenth of their costs from the appellees Winans. Appellee Title and Trust Company shall recover its costs from the appellants.

12. Prosser on Torts, § 106.