**556**

S. BIRCH & SONS, a corporation, C. F. Lytle, a corporation, and Green Construction Company, a corporation, partners doing business as Birch Lytle & Green, Appellants,

v.

Robert L. MARTIN, Appellee.

S. BIRCH & SONS, a corporation, C. F. Lytle, a corporation, and Green Construction Company, a corporation, partners doing business as Birch Lytle & Green, Appellants,

v.

L. A. MARTIN, Appellee.

L. A. MARTIN, Appellant,

v.

S. BIRCH & SONS, a corporation, C. F. Lytle, a corporation, and Green Construction Company, a corporation, partners doing business as Birch Lytle & Green, Appellees.

Nos. 15107, 15108.

United States Court of Appeals Ninth Circuit.

May 15, 1957.

Rehearing Denied June 17, 1957.

Davis, Renfrew & Hughes, Anchorage, Alaska, for appellants.

Bell, Sanders & Tallman, Anchorage, Alaska, for appellee.

Before BONE, FEE and BARNES, Circuit Judges.

BARNES, Circuit Judge.

On August 14, 1952, along a narrow strip of highway approximately six miles south of Anchorage, Alaska, L. A. Martin (hereinafter, Martin Sr.) and his son, Robert Martin Jr., were beaten and bloodied by a group of road construction workers, buoyed by alcoholic beverages and the happy knowledge of a job completed.

Subsequently, the father and son filed these actions against S. Birch & Sons, a corporation, C. F. Lytle, a corporation, and Green Construction Company, a corporation, (partners doing business as Birch Lytle & Green) and five individual defendants, Ross McDonald, Cecil "Joe" Sipes, John P. Bell, Duane J. "Bud" Weber, and Raymond E. Wise, all employees of the aforementioned partnership. The actions were consolidated for trial. The cases were tried by a jury, which returned a verdict in favor of Martin Sr. against the three corporate partners, and Bell and Weber, individually, for $7,000 compensatory and $2,000 punitive damages. The trial judge later directed and Martin Sr. consented to remittitur of $2,500 of the compensatory award. The jury also returned a verdict in favor of Martin Jr. against the three corporate partners, and Weber, individually, for $7,500 compensatory and $2,500 punitive damages. McDonald and Wise were exonerated in each action. Sipes was not served with summons and did not participate in the trial. The defendant partnership alone prosecutes these appeals. Martin Sr. has cross-ap-

pealed, challenging the propriety of the remittitur.

The incident took place alongside and on a twenty-foot wide stretch of highway. The defendant partnership had just completed work on approximately one thousand feet of new paving on the west half of said highway. The narrow width of the highway necessitated vehicular traffic control by flagmen employed by the partnership. These men were stationed at barricades at each end of the construction zone. They permitted north and southbound traffic to travel alternately along the eastern ten feet width of the highway.

Sometime after 6:00 p. m. and before 7:00 p. m., the plaintiffs, driving their automobile south through the gathering twilight at the head of a procession of southbound traffic, were flagged onto the eastern one-half of the highway. After traveling approximately one-half the distance through the traffic control, the plaintiffs' vehicle found its forward progress blocked by a northbound car, driven by Sipes, in which Weber was a passenger. The impasse occurred immediately opposite the gravel pit and asphalt plant, which, together with the partnership office and a scale house, were located off the highway to the west. There was no traffic behind the northbound car; there was an undetermined amount of traffic behind the southbound car. ·

Each driver insisted that the other give him the right of way. An altercation ensued. At this point, the testimony differs. According to the conflicting evidence, Martin Jr., the driver of the southbound car, was grabbed by Weber who stood, "half-soused," with beer can in hand outside the Martins' car window and when Martin Jr. tried to disengage himself, Weber pulled him out of the car, or, he (Martin Jr.) jumped out of his car without provocation to do battle with Weber, who was empty-handed and merely feeling "happy". Martin Jr. was knocked down by one and attacked by four or five men (including Sipes) and kicked in the mouth, or, he knocked down Weber three times, and as one witness positively stated—was never struck himself. The stories of Martin Sr.'s activities are just as disparate. He was struck in the face and knocked unconscious by Bell, either while reaching for a lug wrench in the car trunk, which he sought in order to aid his son, or, after he had obtained the wrench and was rushing into the melee to even it up.

When Martin Jr. saw his father lying on the ground he hurried to his side to protect him from further blows. None were forthcoming. Martin Jr. then lifted his father back into the car and prepared to depart. However, the milling group of men surrounding the car, estimated at ten to fifteen in number, refused to permit them to leave the area. One of the men—supposedly McDonald—told the Martins that "We have taken off you S.B.'s for the last four or five years; now, you're going to listen to us; you're not going anywhere." Martin Jr. obeyed instructions and remained at the scene. His auto, a former taxicab, had a two-way radio in it, and he called the police. After a few minutes wait the Highway Patrol arrived on the scene and plaintiffs were allowed to leave. The entire incident did not consume more than forty minutes.

There is no doubt that the plaintiffs were beaten by someone during the fray. Martin Sr. sustained bloody and cut lips, loss of his set of artificial dentures, a large knot-like lump—"as big as an egg" —on the back of his head, a concussion, and sundry other more minor injuries. Martin Jr. suffered a concussion, a badly cut eye, a bruised knee, had two teeth knocked out and several others loosened.

■ At the trial the defenses of mutual combat and self-defense were presented by counsel for the defendants, but the jury obviously rejected both of them. It apparently accepted plaintiffs' version of the fracas as related above. We cannot disturb its resolution of conflicts in the evidence as to who among the individuals sued bore the responsibility for the assault. Parker v. Title & Trust Co., 9 Cir., 233 F.2d 505; Capital Transit

Co. v. Bingham, 94 U.S.App.D.C. 75, 212 F.2d 241.

The evidence raises certain questions of law. Two distinct theories upon which liability of the defendant partnership could be predicated were submitted to the jury. Plaintiffs sought to impose both vicarious and direct liability on the partnership. Vicarious liability rested squarely on the doctrine of respondeat superior. Direct liability was founded on alleged negligence in failing to use reasonable care to protect highway users during their passage through the controlled area from the unlawful acts of employees.

■■■■■ To hold the partnership responsible under the doctrine of respondeat superior, plaintiffs were required to prove that the attack upon them by the employees occurred during the course and in the scope of their employment.[1] The pummeling administered plaintiffs by Weber, Bell, and Sipes constituted no less than an aggravated assault and battery.[2] Their actions were willful, wanton and intentional. Indeed, plaintiffs contend their conduct was criminal in character.[3] The fact that the unlawful activity was intentional and even criminal does not per se take it out of the scope of employment. "It is accepted law that the master may be liable for the willful and malicious acts of a servant * * * ." Novick v. Gouldsberry, 9 Cir., 173 F.2d 496, 500. But such fact is an important consideration in ascertaining if the specific acts charged occurred while the servant was acting within the scope of his employment. Its precise effect in a given case will vary with the particular factual context involved.

■■■■■ Here the acts complained of constituted battery. "To create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring the servant into conflict with others." Restatement of Agency, § 245, Comment a. What is needed is a functional relationship between the employment and the wrongful act or acts. It must be shown that "the particular tortious act was [not] clearly unrelated to the accomplishment of any of the objects of the employment." Novick v. Gouldsberry, supra, at page 501. Where the connection is too remote and attenuated, the master is not liable. Under such conditions the only reasonable inference to be drawn from the servant's conduct is that he is giving vent to personal feelings and is seeking solely to further his personal interest. "When this is the case, the mere fact that the act which caused the harm was done while the servant was acting in the employment and on the employer's premises would not result in liability. 35 Amer. Jur., Master and Servant, Sec. 55; Restatement, 1 Agency, Sec. 245, Comment (d), p. 550." Novick v. Gouldsberry, supra, at page 501. It must appear that

---

1. N. L. R. B. v. International Longshoremen's & Warehousemen's Union, 9 Cir., 210 F.2d 581.

2. Plaintiffs alleged in their separate complaints that several unidentified "John Does", also employees of defendant partnership, participated in the fight. But they were unable to identify these unknown persons or their employer at the trial. Since persons other than employees of defendant partnership were present at the construction site, it seems highly dubious that the partnership could be held liable for the acts of the unidentified "John Does." In any event, the same considerations that control the question of scope of employment of the identified aggressors would also apply to the unidentified persons.

3. Both parties have devoted much effort to a discussion of liability based on "mob violence." Such conduct is deemed criminal under the law of the Territory of Alaska. A.C.L.A.1949, § 65–10–1. However, it is the general rule, and no Alaska legislative history or judicial decision is cited to the contrary, that such legislation does not create a new basis of statutory liability independent of common law liability. The civil action remains one for trespass or assault committed pursuant to the mob enterprise. 46 Amer.Jur. 135. Accordingly, the text discussion of the partnership's liability for its employees' assaults comprehends this theory.

the employee is acting in part at least in the interests of his employer; mixed motives will suffice. But where the employee acts only to further his own interests, the employer is not liable. Nelson v. American-West African Line, 2 Cir., 86 F.2d 730. The question is essentially one of degree. An assault by a hockey player on a spectator may justify vicarious liability, M. J. Uline Co., Inc. v. Cashdan, 84 U.S.App.D.C. 58, 171 F.2d 132, whereas an assault by one construction worker upon another may not. Park Transfer Co. v. Lumbermen's Mut. Cas. Co., 79 U.S.App.D.C. 48, 142 F.2d 100. Each case must be decided in its own unique factual setting.

 Applying these general principles to the case at bar, we find that both Weber and Sipes were truck drivers, and Bell was a paving operator. None had any duties which necessitated or were likely to call for the use of force. None even had any duties which were likely to bring any of them into direct contact with passing motorists. None was charged with controlling the flow of traffic in the restricted area or with clearing road jams. Moreover, none of the identified trio were *on duty* when the incident occurred. *All* had checked out for the day and were on their way home. The time cards show that Bell signed out at 5:30 p. m. and Weber at 6:00 p. m., while Sipes completed his shift at 5:30 p. m. also. Their continued presence at the work site was due to their desire to participate in the job completion celebration. They had no duties while *on work* which would warrant the conclusion that their wrongful acts were committed while they were acting within the scope of their employment; a fortiori when they were *off work*. The proximity to their employment was geographical not functional. Such proximity is not enough to establish liability.

It is, of course, quite possible that during the course of their labors on this particular project the men became irritated with highway users who interrupted or impeded their work. In their un-inhibited state they may well have pictured plaintiffs as the personifications of the Despised Motorist. Nonetheless, as a distinguished commentator has pointed out, "The servant's act in punishing persons who annoy him in the performance of the service * * * can very seldom be regarded as within the (scope) of the employment." 2 Mechem, Agency, 2 Ed. 1914, § 1978. This is not one of those rare situations.

It might be argued that while the aggravated assaults would not under ordinary circumstances come within the scope of the employment of the known assailants, they would in this particular instance because a managerial official of the defendant partnership either authorized or ratified them. McDonald was the general superintendent on the construction project. There is no evidence in the record that he authorized or approved in advance, or even acquiesced in the attacks upon the Martins. His presence on the scene begins just as the actual brawling was ending. He reached plaintiff's car at the same time Martin Sr. was knocked to the ground. No further physical injuries were inflicted on plaintiffs thereafter. McDonald is charged with detaining plaintiffs and he admits that he ordered them off the road to alleviate the traffic clog. In respect to the remarks he purportedly made to plaintiffs, heretofore quoted in full, which were tinged with antagonism and indicated satisfaction with plaintiffs' plight, there is no credible basis in the record establishing McDonald as their source. Both Martins said they saw McDonald and heard him speak but neither was able to identify him at the trial; in fact Martin Sr. mistakenly identified another man as McDonald. Martin Jr. did *not* testify that he heard the profane taunt, although he was in full possession of his faculties when it was supposedly uttered. Martin Sr. claimed that he heard the remarks while regaining consciousness and while he was still "coming and going" and that an anonymous onlooker identified McDonald as the speaker. This is hardly adequate evi-

dence to bind the partnership, on a theory of ratification, to vicarious liability.

Our holding in the instant cause does not conflict with the decisions of this Court in the Novick v. Gouldsberry, supra, and Pacific Tel. & Tel. v. White, 9 Cir., 104 F.2d 923, cases. In Novick we upheld a judgment against a saloonkeeper for an assault made by a bartender while on duty, on the ex-husband of the bartender's wife. The rationale of the decision was that the bartender, by the very nature of his employment, "was authorized to maintain order in the saloon, and the assault was committed in the course of his keeping order." 173 F.2d 496, 501. In White the employer was held liable for an assault committed upon a suspected robber by its chief special agent while attempting to procure a confession. The agent had general authority to make a full investigation of the robbery and consequently the assault committed pursuant to his investigation did not fall outside the scope of his employment. The bartender in Novick and the special agent in White both had jobs which were likely to bring them "into conflict with others." Restatement of Agency, § 245, Comment (a). In each of those instances it could be said that the employee was acting to some degree in his employer's interest. That vital link—there present—is here absent. The respondeat superior doctrine cannot apply.

The fact that vicarious liability cannot be sustained does not necessarily absolve the partnership from any and all liability.

The relationship of employer and employee creates under certain circumstances a duty on the employer to use reasonable care to control the activities of the employee on the work premises so as to prevent harm to persons coming onto the premises, despite the fact that such activities are not within the scope of employment and are done solely to advance the personal interest of the servant.[4] Prerequisite to liability is a showing that the employer knew or should have known of the necessity and opportunity for exercising such control.

The jury was properly instructed as to the nature and scope of this duty. And a plausible basis for its application to the instant case might be constructed, if it were not for one overriding and insurmountable difficulty.

The scope of the duty in a highway construction zone realistically extends over the entire area where control by the employer is effective. The imposition of the duty is especially appropriate in the immediate vicinity of the highway. It existed at the site of this melee. There was sufficient evidence of appellant's breach of its duty to present this issue to the jury. The evidence shows that McDonald authorized the purchase of whiskey and beer in plentiful quantities for the men. Sipes and Weber, fearful such supply would be insufficient, procured more for their private supply and use. McDonald and Wise, also a Superintendent, were both aware that this was a job completion celebration. It is common knowledge that such occasions furnish the opportunity for, in the vernacular, "letting off steam." They saw the men consume the liquor and then obtain more beer. Surely they perceived the gay frame of mind of the men. They also saw the men congregate and remain in the construction zone area. However, despite having provided the alcoholic beverages to the men, they took no precautions to insure safe passage for motorists through the area. They had the ability to do so. This was incontrovertibly established by the undisputed evidence that when McDonald ordered Weber to desist from further brawling and to leave the area, he (Weber) obeyed. Under such circumstances the question of their negligence, if any, was for the jury to

---

4. Fletcher v. Baltimore & Potomac Ry. Co., 168 U.S. 135, 18 S.Ct. 35, 42 L.Ed. 411; In re Sabbatino & Co., 2 Cir., 150 F.2d 101; Restatement of Torts, § 317; Restatement of Agency, § 213; Harper & Kline, "The Duty to Control the Conduct of Another," 43 Yale L.J. 886, 896 (1934).

562

determine. Thus, it would appear that a valid theory of liability exists to support the jury verdict were it not for one crucial fact. It is, of course, true that the particular theory upon which the jury did base its verdicts is unknown. We already have held that one of the two alternatives—respondeat superior—was unsustainable. We now must hold that the second theory—negligent control—cannot be supported.

■ The fatal flaw in this latter theory is that the defendant partnership would be liable under the facts of this case only if its supervisorial employees, McDonald and Wise, had been derelict in the performance of their duties. The record does not disclose any independent negligent conduct on the part of the partnership itself. There is no evidence that the partners from the facts known or which should have been known to them, knew or should have known of the necessity of taking additional steps to protect the personal safety of passing motorists.[5] If they had any duty to act, it was by and through their superintendents on duty. The record reveals that McDonald and Wise were the only superintendents on duty and at the scene of the fight. They provided the liquor and they were responsible for policing the premises and controlling the men. Yet the question of their negligence in respect to the control of the restricted area was submitted to the jury in the same instruction as was the question of negligence of the defendant partnership. The jury absolved both McDonald and Wise from individual responsibility. We can only conclude therefrom that it found neither was negligent. The master's liability being wholly derivative, the release of the servants bars any recovery against the master. 57 C.J.S. Master & Servant § 619(b), pp. 421–422.

There being no valid basis for the compensatory damages awards, it follows that the awards of punitive damages—resting on the same ground as the compensatory verdicts—cannot stand.

In view of our determination of the instant case we do not reach the merits of other points raised by appellant.

■ The cross-appeal of L. A. Martin remains to be considered. By it, he attempts to contest the validity of the remittitur to which he consented. He was not compelled to do this. He could have had a new trial, but he preferred to choose the reduced amount. He cannot now question the propriety of the judgment to which he gave consent. Lewis v. Wilson, 151 U.S. 551, 14 S.Ct. 419, 38 L.Ed. 267.

The judgments in these consolidated cases are hereby Reversed as to the defendant partners only.

5. See Hedrick v. Fraternal Order of Fishermen of Alaska, D.C., 103 F.Supp. 582.