543 F.2d 601
 1976-2 Trade Cases 61,130
 SHOR-LINE RAMBLER, INC., d/b/a Shor-Line Motors, Inc., an
Illinois Corporation, and George E. Schoenbacher,
Plaintiffs-Appellees and Cross-Appellants,
v.
AMERICAN MOTORS SALES CORP., a Delaware Corporation,
Defendant-Appellant and Cross-Appellee.
 Nos. 75-1302, 75-1342.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 1, 1975.
Decided Oct. 28, 1976.
 
 1
 Francis B. Stine, S. John Templeton, Chicago, Ill., for Shor-Line.
 
 
 2
 James B. O'Shaughnessy, Chicago, Ill., for American Motors.
 
 
 3
 Before CASTLE, Senior Circuit Judge, SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.*
 
 
 4
 CAMPBELL, Senior District Judge.
 
 
 5
 This action was brought in the district court by Shor-Line Rambler, Inc., d/b/a Shor-Line Motors, Inc. and its owner George E. Schoenbacher (hereafter jointly referred to as "Shor-Line") against American Motors Sales Corporation (hereafter, "American Motors") under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-1225. Shor-Line, which had been an American Motors dealer in Evanston, Illinois until its franchise was terminated in July 1972, alleged that, in terminating the Shor-Line franchise, defendant violated those provisions of the Act which authorize a dealer to bring an action against a manufacturer who fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise" (15 U.S.C. § 1222).
 
 
 6
 The jury returned a verdict for Shor-Line in the amount of $334,000, of which $238,000 represented the loss of future profits. Although the trial judge denied American Motors' post-trial motion for a new trial, he also found that the jury had failed to reduce lost future profits to their present value in disregard of the court's instructions. Accordingly, the court conditioned its denial of defendant's motion for a new trial upon plaintiff's acceptance of a remittitur, reducing the loss of future profits to $161,000 and the total verdict to $257,000. Shor-Line timely accepted the remittitur and judgment was entered accordingly.
 
 
 7
 American Motors appeals from the judgment as entered and Shor-Line appeals from the order of the trial court "compelling" its acceptance of the remittitur by conditioning its denial of a new trial upon said acceptance. The two appeals have been consolidated for hearing and decision in this Court.
 
 The Appeal of American Motors
 
 8
 The essential issue presented by American Motor's appeal is whether the jury's verdict as to liability and damages is supported by the manifest weight of the evidence. For the reasons stated below, we conclude that the jury's verdict is supported by the evidence and accordingly we affirm.
 
 
 9
 The evidence showed that between 1959 and 1972 Schoenbacher owned an American Motors franchise known as Shor-Line Rambler, Inc., located in Evanston, Illinois. Between 1959 and 1967, the dealership's used car lot was located across the street from the showroom on rented property. Shor-Line lost the lease on this lot in 1967 and moved its used car inventory to the second floor of its showroom. The second floor had previously been used for storage of new cars.
 
 
 10
 Shor-Line's financial history was less than prosperous. Between 1960 and 1965, Shor-Line's average annual profits were $14,000. American Motors suffered serious financial difficulties between 1966 and 1971 and Shor-Line suffered with them. Shor-Line's losses during this time amounted to approximately $75,000. During this latter period, Shor-Line's bank credit for floor plan financing was reduced from $150,000 to $15,000.
 
 
 11
 Despite its financial difficulties, Shor-Line's franchise was consistently renewed between 1959 and 1971. The last renewal was in 1971 and was to extend to March 17, 1973. At the time of this last renewal, American Motors personnel reported to their home office that the floor space available at Shor-Line was adequate and that the present location and appearance of the facility were satisfactory.
 
 
 12
 The early 1970's was a time of change for American Motors. With the introduction of new models ("Gremlin" and "Hornet") American Motors began producing cars with market appeal that were competitive with other lines. Further, in 1972 American Motors initiated the "Buyer Protection Plan" which included a comprehensive one year or 12,000 mile warranty. Its sales increased substantially.
 
 
 13
 In February of 1972 Schoenbacher was requested to attend a Sales and Profit Conference held at the American Motors Zone Office. Present at the meeting was the American Motors' Regional Manager, the Zone Manager, the Assistant Zone Manager, the Zone Business Manager, and the District Manager. Schoenbacher was instructed that he had ninety days to:
 
 
 14
 (1) Attain his planning potential of 360 cars;
 
 
 15
 (2) Increase his wholesale credit line and maintain a 60-unit new car inventory;
 
 
 16
 (3) Acquire a used car lot and new car storage facilities;
 
 
 17
 (4) Hire a full-time sales manager;
 
 
 18
 (5) Hire and train four additional salesmen;
 
 
 19
 (6) Participate in American Motors' Loaner Program;
 
 
 20
 (7) Participate in American Motors' Corporate Identity Program.
 
 
 21
 Subsequent to the meeting, Schoenbacher was also informed by the Assistant Zone Manager that Shor-Line's facilities were sub-standard and Schoenbacher should attempt to negotiate a lease on certain other facilities that were then available.
 
 
 22
 Schoenbacher introduced evidence that he attempted to comply with the requirements. Within the ninety days he signed up for the Loaner Program and the Corporate Identity Program, and hired a general manager. He also investigated the possibility of acquiring the suggested facilities, but apparently concluded that they were financially beyond his capabilities.
 
 
 23
 On May 18, 1972, the Zone Office recommended that Shor-Line's franchise be terminated because of Schoenbacher's failure to meet American Motors' demands. Shor-Line then brought this action, alleging in part that American Motors terminated the dealership in bad faith as part of a plan to reduce the number of its small dealerships. In essence, Shor-Line alleged that the demands were arbitrary, unreasonable, and impossible to comply with. American Motors offered contrary evidence but the jury found for Shor-Line. As noted above the trial judge reviewed the evidence and wrote an extensive opinion denying American Motors' post verdict motions for judgment notwithstanding the verdict, and for a new trial.
 
 
 24
 Upon our review of the evidence and the record in this case we likewise conclude that the jury's verdict for Shor-Line was not contrary to the manifest weight of the evidence. Rather, as found by the trial judge, the verdict was abundantly supported by evidence which established that Shor-Line had suffered faithfully through the hard years with American Motors and that as recently as 1971, American Motors had reported that Shor-Line's facilities were adequate. Then, abruptly in 1972 Shor-Line was given 90 days to totally change its character. Not only were extensive personnel changes required, but new facilities were requested, all of which demanded unreasonable and unrealistic expenses for the dealer.
 
 
 25
 Despite Shor-Line's efforts to comply with some of the demands, American Motors terminated the franchise. The evidence supports the jury's finding against American Motors.
 
 
 26
 The issue of American Motors' bad faith involves its intentions as manifested by its actions. This is a factual determination for the jury. Artman v. International Harvester Company, 355 F.Supp. 482 (W.D.Pa.1972). Therefore, even though some evidence was introduced to support the contention that American Motors may have been justified in terminating Shor-Line, the jury heard the evidence and returned its verdict. We find no basis for disturbing this verdict on appeal.
 
 
 27
 Apart from questions raised by the remittitur (which we shall discuss below) the damages awarded to Shor-Line were not contrary to the manifest weight of the evidence. Shor-Line's expert witness testified as to his estimate of the damages over a ten-year period. Even though this information was introduced by Shor-Line, American Motors never objected to the use of the ten-year period. Further, a statement made by the President of American Motors, William Luneberg, was introduced into evidence:
 
 
 28
 " . . . by the end of this decade, we'll get one-half a million car sales, and I don't care what the hell the market is then."
 
 
 29
 American Motors' General Sales Manager agreed with Luneberg's projection. Based on this evidence, the jury was justified in determining the damages over a ten-year period. It was properly a question for the jury to determine, Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2d Cir. 1970), and likewise will not be disturbed on appeal.
 
 
 30
 Apart from the ten-year time frame, future profits are a reasonable damages award. In an action under the Automobile Dealer's Day In Court Act, the Tenth Circuit has held that "(t)o be meaningful, such damages must include the amount of money that the dealer could have obtained in the future from the profits from his franchise." American Motors Sales Corporation v. Semke, 384 F.2d 192, 200 (10th Cir. 1967). It was not unreasonable for the jury to infer that Shor-Line would have received profits during this ten-year period but for the termination.
 
 
 31
 American Motors also argues that a new trial should be ordered because the jury's verdict in the amount of $334,000 shows a complete disregard by the jury of the court's instructions that future profits must be reduced to present cash value. It argues that the jury's verdict was thus the result of passion or prejudice against it or a bias in favor of Shor-Line and indicates such a gross disregard of the proper function of the jury that a new trial is required. At trial Shor-Line introduced evidence that its damage equaled $334,000, which represented $96,000 for liquidation damages and profits lost on sale of cars ordered but never delivered by American Motors. The $334,000 figure also represents $238,000 projected as future lost profits. In its instructions the Court admonished the jury that future profits should be reduced to present value.
 
 
 32
 The trial court agreed that the jury's verdict of $334,000 was in disregard of the instructions on present value. The Court further held, however, that this verdict did not represent "a general failure of the jury to properly discharge their responsibilities" or a showing of improper "passion or prejudice". The Court also noted that because of American Motors' failure to tender a "present worth" instruction, it could have ignored its complaint regarding the size of the verdict. However, in the exercise of its discretion the Court ordered that the $238,000 award for future lost profits be reduced to $161,000 present value. The Court then directed that "plaintiff accept a remittitur of the verdict of $77,000 within 10 days or a new trial will be ordered". The denial of the American Motors' motion for a new trial was entered upon plaintiffs' acceptance of remittitur as ordered.
 
 
 33
 From our review of the record, the jury's verdict was certainly within the realm of reason and is by no means an obvious product of passion or prejudice. Furthermore, as noted by the trial court, there existed adequate bases to leave the trial award undisturbed, particularly in view of American Motors' failure to tender a present value instruction. We have considered the other arguments presented by American Motors and find them equally without merit.
 
 
 34
 Accordingly, the judgment appealed from is affirmed.
 
 The Cross-Appeal of Shor-Line
 
 35
 After accepting the remittitur as ordered by the trial court, Shor-Line has taken a cross-appeal from the trial court's order conditioning the denial of American Motors' motion for a new trial upon Shor-Line's acceptance of the remittitur. Shor-Line contends that by virtue of the conditional order it was "compelled" to accept the remittitur, and that the trial court abused its discretion in altering the jury's award.
 
 
 36
 In its brief Shor-Line acknowledges that the settled rule, followed in a great majority of circuits including this one, is that by consenting to a remittitur, a party waives his right to appeal the judgment. See Dorin v. Equitable Life Assurance Society of the United States, 382 F.2d 73, 78 (7th Cir. 1967); Casko v. Elgin, Joliet and Eastern Ry. Co., 361 F.2d 748, 751 (7th Cir. 1966). See also Koenigsberger v. Richmond Silver Mining Co., 158 U.S. 41, 15 S.Ct. 751, 39 L.Ed. 889 (1895); Woodworth v. Chesbrough, 244 U.S. 79, 37 S.Ct. 583, 61 L.Ed. 1005 (1917); S. Birch & Sons v. Martin, 17 Alaska 230, 244 F.2d 556, 562 (9th Cir. 1957); 9 Moore's Federal Practice, P 203.06 at 721.
 
 
 37
 As plaintiff argues, however, the rule is not without its critics, particularly where the other party (such as American Motors here) is allowed both the benefit of remittitur and the right to appeal the judgment of liability. Plaintiff argues that, at least under those circumstances, the party whose verdict has been conditionally remitted should not be forced to surrender his opportunity for appellant review simply because he has chosen, however reluctantly, to accept the remittitur rather than suffer the expense and uncertainty of a new trial.[1]
 
 
 38
 In our view there is much to be said for allowing an appeal by plaintiff following the acceptance of a remittitur under protest, at least in the context of a cross-appeal. We note in particular that in Dorin v. Equitable Life Assurance Society of U. S., 382 F.2d 73 (7th Cir. 1967), Chief Judge Fairchild acknowledged his personal preference for such a rule. 382 F.2d at 78. But we also note that, notwithstanding this preference, he authored an opinion following the more traditional rule established for this Circuit in Casko v. Elgin, Joliet and Eastern Ry. Co., 361 F.2d 748, 751 (1966). Any change in that established rule should await a decision by the full Court, absent which we feel compelled as did Judge Fairchild in Dorin, to follow the prior decisions of this Court.
 
 
 39
 Accordingly, the cross-appeal is dismissed.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Compare Illinois Supreme Court Rule 366(b)(2)(ii), Ill.Rev.Stat. Ch. 110A, § 366(b)(2)(ii) formerly, Section 68.1(7) of the Illinois Civil Practice Act which provides that "(c)onsenting to a remittitur as a condition to the denial of a new trial does not preclude the consenting party from asserting on appeal that the amount of the verdict was proper"
 It appears that the Fifth Circuit also allows plaintiff to appeal after accepting a remittitur. Steinberg v. Indemnity Ins. Co. of North America, 364 F.2d 266, 268 (1966); Edwards v. Sears, Roebuck and Company, 512 F.2d 276, 279 n.2 (1975). Recently, the Second Circuit followed the traditional rule, denying a direct appeal by plaintiff following acceptance of a remittitur, on grounds of judicial economy, Donovan v. Penn Shipping Co., Inc., 536 F.2d 536 (1976), although it remains unclear whether the Second Circuit would refuse to consider the merits of such a claim in the context of a cross-appeal. See, Reinertsen v. George Rogers Construction Corp., 519 F.2d 531, 534-35 (2nd Cir. 1975). Certainly considerations regarding the proliferation of appeals become far less compelling in the context of a cross-appeal, since the appellate tribunal will in any event, be considering other aspects of the case. It may well be that allowing plaintiff to challenge the remittitur on cross-appeal would advance judicial economy, since defendants might then think twice before electing to appeal the remitted verdict. At any rate, as Judge Feinberg notes in his instructive dissent in Donovan, we simply do not have before us any hard facts showing the frequency with which remittiturs are ordered or the number of cases in which they are rejected, thus necessitating a second trial. 536 F.2d at 539 n.2 and 541.